## THE STATE v. KENNEDY, Appellant.

### Division Two, February 20, 1900.

1. **Train Robbery:** INDICTMENT. The indictment, which is set out in the opinion, is held sufficient to charge robbery from an employee of an express company of money belonging to the company.

2. ———: "IN THE PRESENCE" ETC. Robbers with guns and threats of immediate violence forced the express messenger out of the express car to the depot platform, and holding him there under guard, cut the train into two parts, drove the engineer and fireman off the en-

State v. Kennedy.

gine, then ran the front part of the train forward about a quarter of a mile, and there in the presence of the messenger, but after he had been put out of the car, with dynamite blew open the safe and robbed it of about one thousand dollars. *Held*, that the robbery was both taking by violence and force, and in the presence of the agent, although he was not in the car when the safe was blown open and the money taken.

*Held*, by SHERWOOD, J., that the forcible taking of the property in this case, took place when the agent was forcibly separated from the property taken, that is when he was driven out of the car.

3. **Cross-Examination of Co-defendant.** An accomplice, who is called as a witness for the defendant on trial, is subject to cross-examination just as any other witness. His examination need not be confined to such facts as he has voluntarily sworn to in his own case.

4. **Jail Records:** 'IDENTIFICATION. It is competent for a witness to refer to jail records made by himself to refresh his memory as to the dates when defendant was in jail, and such evidence is competent to show that defendant and another of a gang of robbers, there had opportunity to concoct the robbery.

5. **Presumption of Innocence:** REASONABLE DOUBT. Where the court fully and properly instructs the jury on reasonable doubt, its failure to instruct that the defendant is presumed to be innocent until his guilt is established, does not constitute reversible error, although the defendant had asked the court to give such instruction on the subject of the presumption of innocence.

*Held*, by SHERWOOD, J., in a concurring opinion, that this instruction should have been given, but owing to the clear evidence of the defendant's identity and guilt, the judgment should not be reversed because of a failure to give it.

6. **Co-defendant as Witness:** WEIGHT. It is not error to refuse an instruction that the jury should weigh the evidence of an accomplice, who had been tried and convicted, "as they would if he had not been tried." The court can not instruct a jury to disregard the character of a witness.

Appeal from Wright Circuit Court.—*Hon. James T. Neville,*
Judge

AFFIRMED.

*Thos. H. Musick, L. O. Neider, H. E. Frink* and *Henry C. Young* for appellant.

(1)    The admission of evidence in relation to acts done by and conversations had between parties charged to have been implicated in the robbery with defendant, after the perpetration of the robbery and separation of the participants, was erroneous.    State v. Minton, 116 Mo. 615; State v. Hilderbrand, 105 Mo. 318; State v. Melrose, 98 Mo. 597; State v. McGraw, 87 Mo. 164; State v. Duncan, 64 Mo. 266; State v. Ross, 29 Mo. 32; 1 Greenl. Ev. (14 Ed.), secs. 111, 233; State v. Harris, 51 S. W. Rep. 481.    (2)    Evidence in relation to the discovery of mutilated money and jewelry upon the premises of Lewis Nigh and Byrum, after the perpetration of the robbery, should have been rejected.    State v. Scott, 109 Mo. 226; State v. Castor, 95 Mo. 242; State v. Owsley, 111 Mo. 450; State v. Baker, 144 Mo. 323.    (3) The jail record of the jail at Kansas City, was not competent evidence for any purpose.    Neither was the evidence of the jailor competent, which was based solely upon these records. Cannon v. Ins. Co., 78 Mo. App. 131.    (4)    The demurrer to the evidence should have been sustained.    First.    Because, there was no evidence of the incorporation of the Southern Express Company, submitted to the jury.    The certified copy of the charter of the Southern Express Company, not having been read in evidence, and no notice having been taken of it after it was offered in evidence, could not have been considered by them.    Second.    It was not shown in evidence, that the property was taken as alleged in the indictment from the care and custody of Henry W. Newton. Third.    It was not shown in evidence, that the money charged to have been taken in this robbery was taken as charged in the indictment in the presence of Henry W. Newton, or by putting him in fear of some immediate injury to his person. State v. Lawler, 130 Mo. 366; State v. Davidson, 38 Mo.

State v. Kennedy.

374. Fourth. There was no evidence to show the presence of defendant at the time of the robbery, except that of the alleged accomplice Byrum, and no corroborative evidence immediately connecting defendant with the robbery, and identifying him as a perpetrator thereof. There was no evidence except that of accomplice Byrum, identifying, or tending to identify the defendant as one of the parties present at the robbery. (5) The court denied to the defendant, in his second instruction, which was refused, the benefit of the presumption of innocence. This was clearly prejudicial. Coffin v. U. S., 156 U. S. 432; Long v. State, 46 Ind. 582; Linn v. State, 47 Ind. 172; Newsom v. State, 18 So. Rep. 206.

*Edward C. Crow*, Attorney-General, *Sam B. Jeffries*, Assistant Attorney-General, and *W. J. Orr*, for the State.

(1) It appears that the express company's charter is a special act of the legislature of the state of Georgia. We know no rule of law that required the court to submit to the jury this kind of evidence. The interpretation, the validity and effect of this charter were certainly matters to be addressed to the court and not to the jury. This was a question of law on this proof for the court, and not a question of fact for the jury. This is so elementary that it would be cruel to cite authorities in support of it. We, however, venture a few citations of authorities: Powell v. Powell, 23 Mo. App. 365; Myers v. Kansas City, 108 Mo. 480; Sapion v. Coal Co., 88 Mo. 68; Oglesby v. Railroad, 150 Mo. 137; Young v. Bird, 124 Mo. 590; New Madrid v. Phillip, 125 Mo. 61; Mo. L. M. & S. Co. v. Reinhard, 114 Mo. 218. (2) Instruction No. 2 does not correctly state the legal proposition, intended to be stated. It is not the law that the accused is presumed to be innocent "until the jury shall finally render its verdict," but, until his guilt is established by the state by

evidence which satisfies the jury beyond a reasonable doubt. Hence the instruction, as asked, was properly refused. This leaves the single question, whether it was the duty of the court to give one correctly stating this legal presumption. And waiving the question as to whether it was the duty of the court to do so, whether asked or not, we contend that the court did give the defendant the full benefit of this presumption in instructions numbered 6, 7 and 8, on the subject of reasonable doubt. Counsel for appellant contend that these instructions do not embody the presumption of innocence, and cite the case of Coffin v. U. S., 156 U. S. 457, as sustaining this contention. Without stopping to discuss that decision, it is sufficient to say that it is in direct conflict with the decisions of the appellate courts of this state, and the great weight of authority elsewhere. The cases cited in that opinion from Texas and Indiana are based on special statutes of those states, while the case cited from Michigan is limited, if not overruled, by subsequent decisions of the supreme court of that state. State v. Harper, 149 Mo. 514; State v. Young, 105 Mo. 640; State v. Heinze, 66 Mo. App. 136; Underhill on Evid., 360; 3 Greenl. on Evid. (16 Ed.), sec. 29; 1 Jones on Evid., sec. 15; Morehead v. State, 34 Oh. St. 216.

GANTT, P. J.—At the March term, 1899, of the circuit court of Wright county the defendant was indicted for the statutory offense denounced by the Act of the General Assembly entitled, "An Act in relation to the crime of train robbing, and to provide a penalty therefor," approved April 2, 1895. (Laws 1895, p. 160.) He was duly arraigned, tried, convicted, and sentenced to the penitentiary for a term of seventeen years, and from that conviction appeals to this court.

On the night of January 3, 1899, at Macomb, a small flag station on the Kansas City, Fort Scott and Memphis Railroad, in Wright county, the west bound passenger train

on said railroad was held up by armed men and the through safe of the Southern Express Company robbed of its contents. The robbers had arranged with Oscar Ray, a farmer, for the latter to board the train at the station of Norwood, five miles east of Macomb, and pay his way to Macomb, so that the train would be stopped at the latter station. It seems that Ray was not let into the conspiracy, further than he was hired to stop the train as above stated. When the train reached Macomb, Ray got off and went directly to his home, some three miles into the country.

While the train was standing at the station of Macomb, the robbers compelled the engineer and fireman to leave the engine and to go back and uncouple the passenger coaches from the head end of the train. Then the engine, the mail car and combination baggage and express car were pulled away from the station, a distance of between one-fourth and one-half mile, the defendant handling the engine in this movement. The combination express and baggage car was broken into and the through safe of the Southern Express Company was blown open and robbed of its contents, about $900 in currency and several watches. After the robbery, these bandits went to their horses which were left about one-half mile south of the track, and there mounted and rode away in a southeast direction.

Elmer Byrum, Lewis Nigh, Jake Fagley, farmers residing in Douglas county, south of Macomb, from six to eight miles, and defendant Kennedy, William Jennings, and Joseph Sheppard, were arrested and indicted for this crime.

Kennedy was born and lived the greater part of his life in Jackson county, Missouri, and was a locomotive engineer, but had not worked on any road for several years. It does not appear in evidence, in this case, where Jennings and Sheppard lived. But it was shown that Jennings had served a term in the jail at Kansas City during the summer and fall

of 1898, where he occupied a cell near one occupied by defendant Kennedy. This proof was admitted solely for the purpose of showing an opportunity for these parties to become acquainted before the commission of this crime.

The state used Byrum, one of the participants, who testified that the crime was committed by himself, his father-in-law Nigh, Fagley, Jennings, Sheppard and defendant. He also testified that he first met Kennedy at Nigh's house on the morning of December 12, 1898, where Kennedy, under the name of Wright, was introduced to him. That Kennedy, alias Wright, remained at Nigh's a week or ten days and then went over to Fagley's where he stopped until Friday morning, the 6th, after the robbery on January 3, 1899. That Kennedy, alias Wright, claimed that two "pals" were expected from Kansas City, and on Christmas eve these appeared at Nigh's house in the persons of Jennings and Sheppard.

Jennings, Sheppard and Nigh were arrested on Saturday, the 7th day of January, at the house of Lewis Nigh. Byrum was arrested at his home the following day. Fagley was arrested in Laclede county, 65 miles from his home, whither he and Kennedy had fled on Friday after the robbery. Kennedy was arrested in Kansas City on the morning of the 10th of January, 1899, soon after his arrival in the city over the Frisco road from Osceola.

Byrum, as before stated, testified positively that the parties named committed the crime. He was fully corroborated by other witnesses as to dates, persons, places and circumstances, and was not contradicted so far as we can see in a single instance, though it appeared on his cross-examination that he had testified four times regarding this matter.

To corroborate Byrum, the state showed the following facts which the state contends establishes defendant's guilt outside and independent of Byrum's testimony. That on the morning of December 12, 1898 (the day on which Byrum claims to have first met Kennedy, alias Wright), the con-

ductor on the Kansas City, Fort Scott & Memphis Railroad took up, between Springfield and Norwood, a ticket which was stamped and dated as sold in Kansas City on the 11th of December, 1898, and which entitled the holder to passage from Kansas City to Norwood, a station on the above named road about five miles east of the place of the robbery, and about four miles from Nigh's farm.   That on that morning the holder of the ticket got off at Norwood, about 7:30 a. m. On the same morning, on the road leading from Norwood to Nigh's, a farmer J. L. Ryan, met a stranger who inquired the way to Nigh's.   This farmer identified defendant as the same person he had met on the road on the morning of December 12, 1898, and as the same person whom he had afterwards met at Jake Fagley's about Christmas, who was then going by the name of Davis.

The state also introduced a large number of witnesses who had met defendant, alias Davis, at Fagley's.   Among these was Fagley's own son-in-law, who had frequently visited there while Davis was stopping at Fagley's.   It appears in evidence, in fact it was shown by defendant's own witness Fagley, that this same Davis left Fagley's home in company with the latter, before daylight on the morning of January 6, after the robbery on the night of January 3, and that these two rode to Phillipsburg, in Laclede county, a distance of 65 miles and arrived there at 4 or 5 o'clock p. m. of the same day, where they stopped over night with relatives of Fagley.   That the next morning Fagley, and Davis left Phillipsburg, the former returning the same evening, being unable to give any account of the whereabouts of Davis.   Davis was seen by parties who identified defendant as the same man, at various points on a route from Fagley's to Osceola, passing through Douglas, Wright, Dallas, Polk, Hickory and St. Clair counties, and was seen boarding a Frisco train at Osceola before daylight of January 10, enroute to Kansas City, where he was arrested on the same morning.

It also appeared in evidence, and was admitted, that this man Davis claimed to be a land prospector while at Fagley's and though he had been in that neighborhood for three weeks or more, he never had a change of clothing of any kind. That at Phillipsburg and on the road there, he changed his name to Curtis and claimed to be a mule buyer. The witnesses along the route he traveled from Fagley's to St. Clair county all remember him as the man who claimed to be a mule buyer, but was never known to buy a mule or to look at one. They also remember him as the man who rode the small iron gray horse and who wore a cloth cap and whose beard appeared to be several weeks old, except his mustache, which was full.

Byrum testified that the next morning after the robbery he met defendant and the latter warned him to "stand fire," and during their conversation defendant said he had given Fagley the money to buy him a horse to get away on. Fagley, as before stated, was a witness for the defendant and while he denied that Kennedy was the man Davis, he admitted that the latter did give him the money with which he bought the small iron gray horse from Atchison, which horse Davis rode away. This horse was described by witnesses who lived along the route traveled by Davis from Fagley's home in Douglas county, through Wright, Laclede, Dallas, Polk, Hickory and St. Clair, and was finally found and identified by its former owners, Atchison and Parrot, at the farm of Thomas Gill, in St. Clair county, some 3 or 4 miles from Osceola. The last witness who saw the horse before it was found at Gill's, was Dr. Pingry from Osceola who testified that on the road to and some six miles from Gill's, he met a stranger riding the horse and that he stopped him with a view of buying the horse. That he took a good look at both horse and rider. He identified the defendant in court, and the horse at Gill's. The next witness testified that about dusk on the 9th of January, 1899, he met Gill and a stranger, whom he iden-

tified as defendant, on the road from Gill's to Osceola; that they were in a buggy headed for Osceola. The next witness was the city marshal of Osceola, who had met Kennedy in the Kansas City jail several times, and who testified that on the morning of the 10th, before daylight, he saw the defendant board the Frisco train headed for Kansas City. Notwithstanding all this evidence tracing the defendant and the gray horse to Gill's home in St. Clair county, Gill, though a witness for the defendant and in attendance at court, was never called or used by the defense. In this connection, the evidence also shows that Gill had been confined in the Kansas City jail during the fall of 1898 while defendant was there, and that they were well acquainted. In this connection, it should also be remembered that the defendant, in his own behalf, testified that he arrived in Kansas City from Texas on the morning of January 3, the date of the robbery, and he claims to have met and talked with Gill on that date, and Gill is not called to corroborate this statement. The only other person the defendant claims to have met on that date was Hugh Chiles who testified as a witness for defendant and who positively denied having seen defendant on the date named, and claimed that he had not seen him since December 10, 1898, until after his arrest in January. The defendant was fully identified also by the cap he wore. Fagley admitted that, after the robbery, he purchased two cloth caps from a merchant at Norwood—one for himself and one for the man Davis. That Davis wore a cap away on the morning of January 6, after the robbery. This cap was identified by witnesses along the route Davis traveled and was finally recovered and fully identified in court. Defendant, on his arrival in Kansas City the morning of his arrest, bought a new hat and left the cap at the store. The cap was identified by the merchant who sold the two to Fagley.

Again, the defendant, alias Davis, alias Wright, alias Curtis, had beard several weeks old and wore a mustache.

When defendant was arrested in Kansas City his mustache had the appearance of having been just clipped off with hair clippers, his face swollen and hair long and scalp dirty. This was the opinion of his own barber who was called as a witness for the defendant.

The jailor and several deputies from Kansas City were called as witnesses, not for the purpose, as is stated by appellant's counsel, of showing that defendant had been in jail for any crime, but to show his whereabouts on certain dates, and to show the opportunity he had to form the acquaintance of Nigh, who had access to the jail through the latter's brother-in-law, Buckner; with Jennings who was confined in an adjoining cell and who, according to the evidence, had full opportunity to see and talk with the defendant; with Gill, who was confined in this same jail and with whom the defendant left the iron gray horse in St. Clair county; and to further show the date of defendant's release from jail just before his advent into Douglas county. Also to show that after his release on the 1st of December, 1898, up to the 10th of the same month, defendant frequently visited the jail and talked with his old guards, but was not seen by any of these in Kansas City or about the jail after the 10th of December, thereby corroborating Byrum, who testified that Kennedy came to Nigh's the 12th of December, 1898.

These witnesses for the state were not permitted to give the nature of the charge on which the defendant was confined in jail. But defendant's counsel, on cross-examination, brought this out, and finally the defendant, in his own behalf, volunteered this information and went into the history of every charge that had ever been preferred against him, and was permitted to make his defense to each of these without limit.

Neither is it true that the state was permitted to prove admissions or acts of any of the co-conspirators after their separation. It is true that witnesses were permitted to tell

when and where they recovered part of the stolen property, but this was limited by the court to the single purpose of showing the corpus of the crime, and to corroborate Byrum, who testified for the state. In no instance was this evidence received for the purpose of tending to show recent or any possession of stolen property in the defendant as is claimed by the counsel for appellant. No such question was raised at the trial by instruction or otherwise.

In addition to the above, there was a number of circumstances developed by the testimony which also tends to connect the defendant with the commission of this crime. The defendant is a locomotive engineer, and it does not appear that any of the other parties ever had any railroad experience. One of the robbers handled the engine from the time it was taken from the trainmen until the crime was completed. Some one was familiar with the custom of express companies of carrying the through express in one car and the local express in another, because the local express was not disturbed. If the defendant was not the man, Davis, alias Wright, alias Curtis, who left Fagley's before daylight on the morning of the 6th of January, 1899, his ride on horseback through the counties of Douglas, Wright, Laclede, Dallas, Polk, Hickory and St. Clair, is inexplicable when his destination was Kansas City, which could have been reached in twelve hours by rail. Thomas Gill who was well acquainted with Kennedy and with whom the "little iron gray horse" was left on Monday, January 9, was a very important witness for the defendant, and the fact that this witness was in attendance at court as a witness for the defendant, but was not called or used by him, is most significant. Again, the letter which was read in evidence, and which the state's evidence tends to show was mailed from Norwood to parties in Texas, where defendant testifies he had relatives and friends and which was doubtless re-mailed to Hugh Chiles, Kansas City, when read in the light of the defendant's testimony and his

attempted explanation of the letter, points to his guilt. The letter is as follows:

"huston texas D 1898"

"Mr. hu childs

"Dear Sur and frend

"i thought at i would writ you a few lines as.i prumest to Say hy i dident go to Se ma before ilef ididet have time it must be as cold as hell up there fur it iS culder than ever isene it before down here wel iam gowing down in gudalupe county tomorrow and wil be at home or K C. before christmas ileft thear the 11 on the M K T 9-5 p m las Sunday. wel iwil close hoping to se you be fore long

"J. F. Kennedy."

Hugh Chiles was called as a witness for the defendant, and on cross-examination, stated that he was surprised when he got this letter. That he was not expecting any (though the letter says it was promised). That he was not on such terms with the writer that the latter should write him. While the letter on its face shows that it was written as the foundation of an alibi, it bears no date because the writer could not know just when it would reach friends in Texas and be re-mailed, and, the date was evidently omitted to avoid the possible conflict between the date of the letter and the Texas postmark, or it was omitted to suit the exigencies which might arise.

This is a brief summary of the evidence connecting the defendant with this crime. Now, in rebuttal of all this, the defendant alone takes the stand and swears that he left Kansas City on the night of December 14 for Texas, where he arrived on the 17th or 18th. That he returned to Kansas City on the morning of January 3 from Texas, and the only persons he met in Kansas City, his old home, according to his own evidence, was Thomas Gill and Hugh Chiles. The latter was a witness in the case and denied seeing defendant on the 3d day of January, 1899. Gill, although a witness at

court up to the very day that defendant went on the stand, was never called or used. The defendant also admitted that he wrote a letter, which was read in evidence, to witness Hugh Chiles, which he claims was written in Texas, which the state's evidence tends to show was mailed from Norwood to parties in Texas, to be there re-mailed to Kansas City. Be this as it may, the letter contradicts the writer because it says that the defendant left Kansas City on the night of the 11th, the very day the state claims that defendant took the train for Norwood. The defendant tried to claim that the figures "11" were written by some one else. But this explanation fails when it is remembered that the letter also gives the date as Sunday, which was also the 11th, and not on the 14th, the day he claims to have left for Texas.

I.   The statute upon which this prosecution is based was enacted April 2, 1895 (Laws 1895, p. 160), and is in these words.

"Section 1.   *Train robbing declared a felony—punishable by death or imprisonment.*   Any person who shall place upon any railroad track any obstruction or explosive substance, or shall remove, displace or injure any rail, tie, switch, frog, bridge or trestle, with the design of robbing any person, passenger, employe, agent or company on any railway train, engine, tender, car, or coach, on any railway in this state, or who shall in any way stop, detain, or arrest the progress of any such train, car, engine, tender or coach with the intent to commit robbery thereon, or having in any way entered any car, coach, tender, engine, express car, mail car, or other apartment of any such train, shall there rob any person or persons, employe, passenger or agent, or any express company or mail pouch or car, of any money or valuable thing, whatsoever, either the property of such person, agent, passenger or employe, or the property of another in his care or custody, shall be guilty of a felony, and on conviction shall be pun-

ished by death, or confinement in the penitentiary for a term of not less than ten years."

There were three counts in the indictment but as the circuit court restricted the jury to the third count it will be sufficient to reproduce that. Omitting the caption the said count is as follows:

"The grand jurors aforesaid, upon their oath aforesaid, do further present and charge, that on the said 3d day of January, 1899, at and in the county of Wright and state of Missouri, said John F. Kennedy, having then and there feloniously entered a certain railway car, to-wit, a baggage and express car of the westbound passenger train No. 4, the property of the Kansas City, Fort Scott and Memphis Railway Company, a corporation organized and existing under the laws of the state of Missouri, being then and there run and operated on the track of the said railway company, did then and there in and upon one Henry W. Newton, feloniously make an assault and him the said Henry W. Newton in fear of some immediate injury to his person, did put, and by force and violence, nine hundred dollars, all of the goods and property of the Southern Express Company, a corporation duly organized and existing under the laws of the state of Georgia, and the said nine hundred dollars being then and there in the care and custody of the said Henry W. Newton, and he, the said Henry W. Newton, being then and there the employe and the agent of the Southern Express Company, he, the said John F. Kennedy, said nine hundred dollars lawful money of the United States aforesaid, the property of the Southern Express Company aforesaid, from the care and custody in the presence and against the will of the said Henry W. Newton, by then and there putting him in fear of some immediate injury to his person, and then and there feloniously and violently, did rob, steal, take and carry away, against the peace and dignity of the State."

It will be observed that this indictment alleges every

fact necessary to constitute a good indictment at common law for robbery save and except it does not aver the money stolen was the property of the express agent Henry W. Newton, but charges said money was the property of the Southern Express Company, and to bring it clearly within the Act of 1895, it also avers that the defendant feloniously entered into the railway car of the Kansas City, Fort Scott & Memphis Railway, then and there at the time being run and operated upon said railroad in Wright county.

The indictment is sufficient to charge the offense under this act.

We come now to consider the claim of defendant that the evidence did not support the charge. As stated by counsel for defendant the evidence overwhelmingly established that the robbers and their fellows in the crime, forcibly entered the car and by the exhibition of a gun and significant threats compelled the messenger, Mr. Newton, to leave the end of the express and mail car and stand on the railroad platform, and while thus under guard, the robbers cut the train in two parts and moved the forward portion west, something like a quarter of a mile, and there in the presence of the messenger blew open the safe in the car with dynamite and having robbed it of its contents, about one thousand dollars, then departed.

The contention is that these facts do not establish that this robbery was committed "in the presence, and against the will and by violence, or putting the agent in fear of immediate injury to his person."

It has long been decided that it is unnecessary to charge a putting in fear in the indictment or to prove actual fear, for if the fact be laid to be done violently and against the will, the law *in odium spoliatoris* will presume fear. [State v. Stinson, 124 Mo. 447; State v. Lawler, 130 Mo. loc. cit. 370, 371.]

That the robbers with arms and threats of immediate

violence, forced the agent and his assistant out of the express car to the platform, and by like force cut the train into two parts, and drove the engineer and fireman off of the engine, and then run the front part of the train forward about one-fourth of a mile, is conceded, but it is urged that because the robbers applied the dynamite after they had pulled the train away from the station and after they had put the agent out of the express car, it was not in his presence.

Clearly this is not good law. At common law no such a distinction as this was allowed. Chitty, in his Crim. Law, 3d vol. marginal page 803, says: "But if the property be taken in the presence of the party, this will suffice; so that to take a horse standing near its owner, or to drive away his sheep or cattle before his face, after putting him in fear, is robbery." [3 Coke's Inst., 69; 4 Blackstone's Com., 243; Roscoe's Crim. Ev. (11 Ed.), 887; U. S. v. Jones, 3 Wash. C. C. R. 209; Rex v. Fallows, 5 Carr & P. 508.]

In this case the force and violence were applied in the inception of the crime. The defendant began the robbery by forcing the express agent out of the car by actual violence and then without any interruption, cut the train into two parts and moved the front portion containing the express safe with the money in it west a quarter of a mile and then blew open the safe and robbed it of its contents. In a word, it was a continuous series of acts all contributing to and culminating in the complete crime of robbery; and in contemplation of law, it was both a taking by violence and force, and in the presence of the agent. Greenleaf lays it down that it is sufficient if it be proved that the taking by the robber was actually begun in the presence of the party robbed, though it were completed in his absence. [3 Greenl. Evid. (14 Ed.), 228; Merriman v. Hundred of Chippenham, 2 East P. C. 709; 2 Russ. on Crimes (Eng. Ed.), 91.]

II.    To the insistence that the trial court erred in permitting proofs of acts done and conversations had by parties

charged with the robbery after the offense was completed
and out of the presence of defendant it must be a sufficient
answer to say that this contention is a misconception of the
evidence and its purpose.    It was entirely competent to cor-
roborate the evidence of the accomplice Byrum by proof of
finding the mutilated money at the places where he had
stated it was hid.    So also it was proper to prove the purchase
of "the iron gray horse" by Fagley for defendant because
it was shown by Fagley, defendant's own witness, that he
bought this horse for Davis, whom the state's evidence abund-
antly showed was defendant himself, and for the further rea-
son that Byrum testified that on the morning after the rob-
bery defendant told him he had given Fagley the money with
which to purchase the horse.

In a word, it was in law the proof of defendant's act, not
that of one of his co-conspirators  and fellow robbers after
the termination of the robbery.

III.    Complaint is made that the court erred in the
cross-examination of Fagley, one of the robbers who testified
in defendant's behalf.    Counsel insist that because Fagley
could not have been required to answer to any facts which he
had not voluntarily sworn to in his own case, the same privi-
lege extended to defendant in this case.    This is obviously
not true.    Fagley was called as a witness and testified for
defendant.    He was then subject to cross-examination just
as any other witness.    The exemption invoked is one which
the law allows only to a defendant when a witness in his own
case, and not when testifying for another.    It is moreover
a personal privilege which he alone can claim and not a third
person who uses him as a witness.    He not only had no ex-
emption from cross-examination but he asked none and the
point was correctly ruled against defendant.

IV.    The point that the jail record at Kansas City was
not competent, seems to have been made without inspection
of the transcript.

As a matter of fact said record was not introduced or read in evidence. The jailer simply referred to the record, one made by himself, to refresh his memory as to the dates when defendant was in the jail and when he was discharged. For such a purpose he had the unquestionable right to use it. Equally without merit is the further objection to this evidence that it was offered to prejudice defendant's case by showing, he had a jail record.

The purpose of this testimony of the jailer was to show that defendant and Jennings, another of the gang of robbers, were in jail together just prior to the robbery and had opportunities to concoct their plan and to show that defendant had been discharged from jail in time to be at Nigh's in Douglas county, when the other witnesses say they saw him there. These witnesses were not allowed to state for what offenses defendant was in jail. It was reserved for defendant to go into these details with great particularity. If aught of harm resulted to him on this account, it was of his own doing.

V. Again, it is said that the conviction ought not to stand because the charter of the Southern Express Company was not submitted to the jury. As a matter of a fact a duly certified copy of the Act of the Legislature of Georgia incorporating said company was duly offered by the state and over the objection of defendant was admitted in evidence by the court and its substance stated to the jury.

In addition to this several witnesses testified that the safe belonged to the Southern Express Company without any objection whatever.

There is little merit in this kind of exceptions.

The charter was in evidence and any juror or the defendant and his counsel were at liberty to read it at length.

The instruction numbered two given by the court is challenged as erroneous.

That instruction is in these words:

"2d. If you find from the evidence that the defendant

John F. Kennedy with any other person or persons at the county of Wright and state of Missouri, on the night of 3d day of January, 1899, did feloniously enter a baggage and express car belonging to and being a part of the westbound passenger train No. four of the Kansas City, Fort Scott & Memphis Railroad Company, it being then and there run and operated on the tracks of said company, and having so entered said car, did then and there feloniously take from one Henry W. Newton, or from his care or custody any sum of money, the property of the Southern Express Company, in his care against his will by force and violence or by putting him in fear of immediate injury to his person, then you will find the defendant guilty and assess his punishment at death, or by imprisonment in the state penitentiary for any term of not less than ten years."

It will be observed that it submits to the jury every fact made essential by the statute and charged in the indictment. It expressly submits to the jury whether said money was taken by force and violence and this being so, the objection for failure to do so falls to the ground.

VI.   Instruction No. 6 is likewise challenged for failure to specify the element in which the accomplice should be corroborated, but as the instruction is practically a rescript of similar instructions approved by this court this objection is not well taken.   [State v. Harkins, 100 Mo. 666; State v. Crab, 121 Mo. loc. cit. 565; State v. Dawson, 124 Mo. 422; State v. Donnelly, 130 Mo. 642; State v. Sprague, 149 Mo. 409.]

VII.   This brings us to the question so earnestly argued in the brief and orally by counsel.   It is this, the defendant prayed the court to give an instruction No. 2, in these words: "The law presumes the defendant innocent and this presumption of innocence attends and surrounds him through every stage of the case until the jury shall finally render its verdict."

No doubt, we take it, can longer exist that the presumption of innocence is indulged in favor of every person charged with crime and that his guilt must be established beyond a reasonable doubt, but the question is, if the court properly and fully instructs the jury on reasonable doubt will its failure to instruct the jury that the defendant is presumed to be innocent until his guilt is established, constitute reversible error in and of itself?

On the side of the defendant is to be found the Supreme Court of the United States in United States v. Coffin, 156 U. S. 432, on writ of error to the district court of United States for Indiana. In an opinion by Justice WHITE the refusal of an instruction in all respects similar to the one refused in this case was held reversible error. The learned justice traced the history of the presumption of innocence and drew the distinction between reasonable doubt and the presumption of innocence.

As indicating the want of unanimity of judicial opinion he says: "The authorities upon this question are few and unsatisfactory." He cites cases from Texas and Indiana holding it necessary to state to the jury the presumption of innocence but concedes that in both states statutes required it. In Michigan it has been ruled error to refuse it when asked, but a failure to give it when not prayed was not error. [People v. Potter, 89 Mich. 353; People v. Graney, 91 Mich. 646.]

On the other hand it has been expressly ruled, after full consideration in Ohio, that it is not error to refuse to charge the presumption of innocence where the court correctly instructed on the doctrine of reasonable doubt. In Morehead v. State, 34 Ohio St. loc. cit. 217, Judge McILVAINE for the court said: "Unquestionably, the defendant was entitled to the benefit of the legal presumption of his innocence. We think, however, it was given to him. The benefit of the presumption of innocence was fully and practically secured to

State v. Kennedy.

him in the instruction that the state must prove the material elements of the crime beyond a reasonable doubt."

The Court of Appeals of Kentucky, also, had the identical proposition before it in Stevens v. Commonwealth, 45 S. W. Rep. 76, and held just as the Ohio court did, that while the presumption of innocence might have properly been stated to the jury, he had the full practical benefit in the requirement that his guilt must be established beyond a reasonable doubt.

In Alabama and California the presumption of innocence and reasonable doubt are seemingly treated as synonymous. [Ogletree v. State, 28 Ala. 693; Moorer v. State, 44 Ala. 15; People v. Lenon, 79 Cal. 625.]

In this state it has been ruled in at least three cases that it is not reversible error to refuse an instruction stating the presumption of innocence when the court had fully instructed on the doctrine of reasonable doubt. [State v. Young, 105 Mo. 640; State v. Harper, 149 Mo. 514; State v. Heinze, 66 Mo. App. 136.] While it is now usual and we think the proper course to instruct the jury that the law presumes the innocence of the defendant, and before the jury can convict him they must find him guilty beyond a reasonable doubt, yet when the court has, as in this case, fully instructed in his favor on the doctrine of reasonable doubt and the evidence so abundantly sustains the verdict of the jury, we do not think the sentence should be reversed solely for the failure to state the presumption. We cited United States v. Coffin, 156 U. S. 432, in State v. Hudspeth, 150 Mo. 30, *arguendo* to show that the circuit court in that case erroneously required the defendant to prove his innocence, but the question now before us did not arise in that case.

We adhere to our previous decisions on this point. It is not easy to determine when the courts of this state first began to state this presumption in their instructions to juries,

VOL. 154 mo—19

but it is true that for many years it was the opinion of both bench and bar that the instruction that "before the jury could convict they must be satisfied of the guilt of the defendant beyond a reasonable doubt," secured to him the full benefit of the presumption. [Baldwin v. State, 12 Mo. 223; Gardiner v. State, 14 Mo. 97; State v. Nueslein, 25 Mo. 111; State v. Lewis, 69 Mo. 92; State v. Edwards, 71 Mo. 312.]

VIII. No error was committed in refusing the 4th instruction asked by defendant to the effect that they should weigh the evidence as they would if "Mr. Fagley" was yet untried.

This "Mr. Fagley" had been indicted, tried and convicted of this same robbery before he testified in behalf of defendant. It would have been a monstrous perversion of the law to have required the jury to have ignored the character of Fagley and his conviction of an infamous crime and accorded to him the same credit they would have given him if he had not been charged and found guilty of robbery. They had a right to take into consideration the fact of his conviction in weighing his evidence.

IX. The remaining assignments must be disposed of by saying that the instructions refused were given in others given by the court of its own motion, and the mere disturbing the order of the trial clearly worked no injury to the defendant.

Upon the whole the defendant had a fair and impartial trial and the evidence fully supports the verdict of the jury and the judgment is accordingly affirmed.

*Sherwood* and *Burgess, JJ.,* concur; Judge *Sherwood* in a separate opinion.

SEPARATE CONCURRING OPINION.

SHERWOOD, J.—Robbery in the first degree under our statute may be committed either by forcibly taking from the person or in his presence and taking a person from his

property is the same in law as taking the property from his person, in short, it is the felonious dispossession of the owner of his property; or the property may be taken in the presence of the party in charge of the property under the Act of 1895, *supra*.

Such taking, in either case, is complete whenever the act of dispossession is accomplished. In the present instance, the forcible separation of the owner or *quasi* owner from his property occurred when the agent of the Southern Express Company was driven out of his car at the point of the revolver. The subsequent removal of the car westward a quarter of a mile, the blowing open of the safe, added nothing whatever to the criminality of the act already done. The taking was complete whenever the act of dispossession was complete. They constituted but one and the same act.

The only point upon which I have any doubt is the refusal of the instruction respecting the presumption of innocence. It should have been given; but inasmuch as the evidence of the identity and consequent guilt of defendant is so clear, I have with some degree of hesitation concurred in affirming the judgment, believing that in the circumstances stated, no error demanding reversal has occurred.