## STATE v. CLINE.

Evidence **held** sufficient to establish the corpus delicti in a trial for horse stealing.

Evidence **held**, sufficient to connect accused with horse theft.

Where a conspiracy to steal is established, evidence of transactions between two of the coconspirators is admissible against a third.

In a larceny trial, a witness who testified to statements made by accused to him concerning the transaction was properly permitted to testify that in the same conversation accused said that he and his associates "framed up a pretty good story" concerning another theft.

In a larceny trial, any error in permitting a witness to state whether she ever had a telephone conversation with accused, who he said he was when he phoned at other times, and whether it was the

same voice, was harmless, where the subject of the conversation was not shown.

An instruction on circumstantial evidence was properly refused, where but a very small part, if any, of the evidence was circumstantial.

Requested instructions substantially covered by the charge as given are properly refused.

In a trial for larceny pursuant to conspiracy, it was proper to instruct that in a case of that kind, where two or more person enter into a combination or arrangement to commit a crime, each is responsible for the acts of all, where these acts lead to a crime, and that all are equally liable for the acts of each.

An instruction that there can be no presumption to begin with against accused; that he comes clothed with the presumption of innocence—is not obejctionable as implying that the presumption might be changed during the trial, before the jury are satisfied beyond a reasonable doubt of accused's guilt.

Failure to instruct on presumption of innocence is not reversible error in the absence of a request, especially where the jury are instructed that they must be satisfied of accused's guilt beyond a reasonable doubt.

(Opinion filed June 28, 1911.)

Appeal from Circuit Court, Hyde County. Hon. LYMAN T. BOUCHER, Judge.

Fred Cline was convicted of larceny, and he appeals. Affirmed.

*Gardner, Fairbank & Churchill, John Pusey* and *C. E. Noel,* for appellant. *Royal C. Johnson, Atty. Gen.,* and *M. Harry O'Brien, State's Atty.,* for the State.

CORSON, J. Upon an information filed by the state's attorney of Hyde county, the defendant was charged, in connection with Frank Brandell and George McCarthy, with the crime of grand larceny in stealing one brown mare, the property of W. L. Thompson. Brandell and the defendant were granted separate trials, and the defendant having been convicted in the circuit court has appealed to this court from the judgment of conviction and order denying a new trial. Frank Brandell having been convicted appealed to this court, and the decision of the circuit court was affirmed; the case being reported in 26 S. D. 642, 129 N. W. 242. The information is quite fully set out in that opinion, and it will not, therefore, be necessary to again set it out in this opinion.

[1] It is contended by the appellant that the evidence in this case does not establish the corpus delicti, nor connect the defendant with the alleged larceny of the animal described in the information. The first part of the contention, that the evidence does not establish the corpus delicti, was presented on the trial of the case against Frank Brandell, and after a full consideration by this court of the evidence, practically the same on this point as that introduced in the case at bar, it concluded that there was sufficient evidence to justify the jury in finding that the mare described in the complaint was feloniously taken from the possession of W. L. Thompson, the alleged owner.

It is disclosed by the evidence that the mare alleged to have been stolen was taken from the possession of its owner, W. L. Thompson, by Charles Bowman, acting with and under the direction of Frank Brandell and the defendant; that the animal was brought by Bowman to a barn or stable in Highmore, from which the same was taken a day or two subsequently by Frank Brandell and shipped by him to McCarthy, at St. Lawrence. The description of the animal as testified to by Thompson was, in the opinion of this court in the former case of state against Brandell, held to be practically the same as the description of the mare in the information as having been missed from his band of horses about the time alleged in the information, and, assuming that the testimony of Bowman was sufficiently corroborated, we are of the opinion that the contention of counsel in the case at bar that the evidence was insufficient to prove the corpus delicti is clearly untenable, and that the evidence is sufficient to connect the defendant with the alleged larceny. It is true there was no direct evidence as to an agreement or conspiracy on the part of the defendant in connection with Brandell and Bowman to feloniously take the property described in the information, other than the statements made to Bowman and McIver and testified to by them; but the testimony of Bowman, corroborated as it is by the testimony of McIver, clearly shows that there was such a conspiracy or agreement on the part of the defendant, Brandell, and Bowman. These statements testified to as made by the defendant to the witnesses, Bowman and McIver, if believed by the jury, were clearly suf-

cient to justify them in finding that the defendant was a participant with Brandell and Bowman in the crime. The evidence as to the connection of the defendant with the alleged larceny consists of statements made by the defendant to Charles Bowman,. an accomplice, and Milton McIver, an accessory after the fact, who were witnesses on the part of the state.

Charles Bowman testified, in substance, as follows: About the 20th or 25th of November, 1908, I saw Fred Cline in front of the bakery in Highmore, S. D., I had a conversation with him there. He asked me if I had got that brown mare out at Thompson's yet. I told him, "No, I hadn't got her yet, and he said, "Didn't know," and walked off. I met him again during the month of November, 1908, in front of Wilder's livery barn. Had a conversation with him there. That was about the last of November, 1908. He asked me if I had got her yet, and I said, "No." He said he would like to have me get her in, because he had a chance to sell her. I saw the defendant about December 9 or 10, 1908, at Highmore, S. D., on the north side of Burke's saloon. I had a conversation with him at that time. I asked him when they was going to pay me that money for getting those horses, and he said that Frank Brandell had told him that he had paid me the money. I saw the defendant, Fred Cline, about the 9th or 10th of January, 1909, at Wilder's livery barn in Highmore, S. D., Fred Cline, Frank Brandell, and myself were there. I had a conversation with them at that time. Frank Brandell said for me not to push him so much for the money that he owed me. He would help me along all he could. Frank Brandell said they would always help me when they could. I saw the defendant, Fred Cline, in Highmore, on the 28th of March, 1909, at Winan's livery barn. Frank Brandall came. We were all three in the barn then. Frank told Fred that we had been caught stealing horses, that Thompson had found his mare, and he would have to do something about it. Would have to frame up some story to get out of this. Fred said that Milt McIver had a mare that looked something like this Thompson mare, and if they could frame up some kind of a story on this other mare, and that I had better go and see Milt McIver about it. Fred said that I was

young, and it would not go hard with me if I got pinched for this. Fred Cline said that he would go and phone McCarthy and put him wise. He went in the office of A. D. Winan's livery barn and phoned to St. Lawrence.

He then proceeded to testify as to the manner in which he took the animal from the band of horses belonging to Thompson; the bringing of the animal to Highmore and putting her in Gardner's barn; that he took the animal back and left it with Dobson's band of horses for a day or two, and then brought it again and placed it in Gardner's barn; and the testimony of other witnesses tended to prove that Brandell took the animal and shipped it to McCarthy.

Milton McIver testified in substance as follows: I am acquainted with the defendant, Fred Cline. I have known him 10 or 12 years. I saw him in Highmore the last of March, 1909, at the Buffalo saloon. I had a conversation with him at that time. He said, "How did you get along in that story you told the state's attorney the other night?" and I told him I got along pretty good; only made one mistake, and that was as to the price. He says, "You want to stand pat and stick to the story; that's all you can do." He said, "Ellis will be here in a few days, and we'll fix it with him," and, "I haven't seen George McCarthy, for he is down at Chamberlain, in the hospital, and I am going down there to see him." Charley Bowman's name was mentioned in that conversation. He said, "You don't want to mention my name or Frank's" (that is, his brother Frank), "because they haven't any evidence against us, and the only evidence they can get is from you and Bowman." And he said, "You want to keep quiet." I asked them how it was, and he said, "Brandell and I got up to go out and steal this Thompson mare; but no one knows I am in to it, unless Charlie or you gives the thing away." He said, "We framed up a pretty good story down in Hand county on the Wilson horse, and we thought they just about had us, when we brought in the other horse and switched horses on them." "Q. Was there anything further said about Charlie Bowman and Frank Brandell in this conversation? A. He said, 'Just as soon

as we found out that Thompson's mare was coming back,' he said, 'Frank and I got together and fixed up this story.' He said, 'I fixed it up and Frank agreed to it, and we fixed it up with Bowman over there in Winan's livery barn the day he went out to see you on Sunday.' He said, 'That mare of yours out at Will Thompson's looks just exactly like the mare we got, all except a tan spot on the flank.' He said that 'Your horse has not got that, but all the horses are kind of tan color all over in the winter time, so that won't be noticeable. She is just about the same size and build.'" I met Fred Cline two or three days after that in front of the pool hall in Highmore. He first said, "Ellis is back." That's the reason I came in." He said, "Frank, my brother, heard he was coming up last night, and he sent Charley Bowman down to the place about 2 o'clock last night, and told me to come up and Ellis and I would get together on that story." He said, "Ellis is all right; he is in here with Thompson now, and is trying to find out what he knows and what is done." He said the weight was about 1,300 pounds. "That is the weight of both your mare and the Thompson mare." He said he thought he would have to drive down to Chamberlain to see McCarthy. He said he heard he was almost dead. He said, "If he dies, maybe we can throw it on him." Just before I went away, I had another conversation with Fred Cline on the street in Highmore, about the 4th or 6th of April, 1909. I left just about that time. I asked him what he was going to say about it, and he said, "I don't know just yet. If any of us gets arrested, we'll send for you." He just said that Thompson would not know her if he did find her, because she was clipped.

It is conceded that Charles Bowman was an accomplice, but it is not claimed that Milton McIver had any connection with the original taking of the animal, or was a party to the conspiracy; his only connection apparently being an accessory after the fact.

It will be noticed that McIver testified that: "I asked them (the defendant and Brandell) how it was, and he (defendant) said, 'Brandell and I got up to go out and steal this Thompson mare, but no one knows I am in to it, unless Charley or you gives the thing away;'" and that he again testified: "He (de-

fendant) said, 'Just as soon as we found out that Thompson's mare was coming back, Frank and I got together and fixed up this story.' He said ,'I fixed it up, and Frank agreed to it, and we fixed it up with Bowman over there in Winan's livery barn the day he went out to see you on Sunday.' "

[2] The question presented, therefore, is, Was there sufficient evidence to prove that the defendant was connected with the alleged larceny, or that he entered into a conspiracy with Brandell and Bowman to steal the animal described in the information?

It will be noticed that by the testimony of Charles Bowman he had a conversation with the defendant prior to the taking of the animal from Thompson's premises in which he was asked by the defendant if he had "got that brown mare out at Thompson's yet." Again the witness Bowman says: "He asked me if I had got her yet, and I said 'No;' " that the defendant then said "he would like to have me get her in, because he had a chance to sell her;" and the defendant, in the statements made by him to McIver, admits that he and Brandell "got up to go out and steal the Thompson mare," and it clearly appears from the testimony of McIver that the defendant was one of the parties connected with the larceny.

We are clearly of the opinion, therefore, that the evidence of Bowman, corroborated by the testimony of McIver, as to the statements made at different times by the defendant as to his connection with the transaction, was sufficient to sustain the finding of the jury that the defendant was connected with the larceny. While the jury would not have been justified in finding a verdict against the defendant upon the testimony of Bowman, who was an accomplice, alone, yet we are inclined to take the view that the evidence of McIver, corroborating as it does practically the evidence of Bowman, in connection with the other evidence in the case, was clearly sufficient to sustain the verdict of the jury in finding that the defendant was a participant in the transaction resulting in the taking of the property. For, assuming that the statements of the defendant as testified to by Bowman and McIver were true, they are clearly inconsistent with any other

theory than that the defendant had entered into an arrangement with Brandell and Bowman to commit the crime, and actually participated in the same.

This court held, in the case of State v. Phillips, 18 S. D. 1, 98 N. W. 171, that the testimony of an accessory was sufficient to sustain a conviction in the absence of corroborating testimony, and the evidence required to corroborate the testimony of an accomplice was very fully considered and discussed in State v. Hicks et al., 6 S. D. 325, 60 N. W. 66, and State v. Brandell, supra, and it will not be necessary, therefore, to further discuss these questions in this opinion.

The story referred to by the witnesses Bowman and McIver is thus related by McIver: "A. I told the state's attorney that I had sold the brown mare to Charles Bowman the winter before, and that she was put in Will Thompson's pasture and left there all summer and all that winter, and I also told him that Bowman had not paid for the mare in full, and that I had turned the mare in to him for work. I owed him about $50 for work, and I turned the mare in for about $110, and he was owing me about $50 more, and I was keeping track of the mare until Bowman had paid me the other $50 for the mare, and Bowman came out to Pete Larson's that Sunday and told me."

[3] It is further contended by the appellant that the court erred in certain rulings in admitting and rejecting testimony. In the examination of Bowman, he was asked as to what he did at Chris Drew's at McIver's, and at Pete Larson's, and what he was doing and what he was talking about, during which time the defendant was not present, and therefore the court erred in admitting this evidence over the objection of the defendant's counsel. These questions were propounded to Bowman when testifying as to the taking of the property, which fact it was necessary to prove in order to convict the defendant, and though the defendant was not personally present when these conversations were had, if, as claimed by the state, he was a participant in the larceny by means of an agreement entered into by him with Brandell and Bowman, all that occurred in the commission of the crime

affected him, as well as Bowman and Brandell. If the conspiracy or agreement, claimed by the state to have been entered into by the defendant with Brandell and Bowman, was established, all the circumstances relating to the transaction occurring between Bowman and Brandell were admissible as against the defendant. But, assuming that this testimony was immaterial and therefore inadmissible, it is quite clear that no prejudice resulted to the defendant by reason of the same which would entitle him to a new trial.

[4] It is further contended by the apellant that the court erred in overruling the objection to, and in refusing to strike out, the testimony of the witness McIver in answer to the following question: "Q. Was anything said about any other horse than this Thompson horse?" to which the witness answered: "He said, 'We framed up a pretty good story down in Hand county on the Wilson horse and we thought they just about had us, when we brought in the other horse and switched horses on them.'" A motion was made by the defendant to strike out this answer as having no bearing on the issues in this case and as being immaterial, but this motion was denied. This testimony was given by the witness McIver when detailing the statements made to him by the defendant as to his connection with the transaction resulting in the larceny of the property in controversy, and in fabricating the story that was to be told by Bowman and McIver in relation thereto, and constitutes a part of the statement made by the defendant to the witness. The testimony, therefore, as to this statement, in connection with the balance of the statements testified to by the witness was clearly admissible as constituting a part of defendant's statements.

[5] It is contended by the appellant that the court erred in permitting the witness Mrs. Robert Shepherd to answer the following questions: "Q. Did you ever have any conversation over the phone with Mr. Cline?" "Q. Who did he say he was when he phoned at these other times?" "Q. Was it the same voice you heard over the phone? State whether or not it was, and you recognized it as the same during these different conversations." These

questions were objected to on the ground that they were hearsay, and not within the personal knowledge of the witness. The witness testified that she had a talk with some one over the phone from Highmore, March 28, 1909. and that the person who talked with her over the phone claimed to be Fred Cline. What this conversation was does not appear from the record, and therefore whether the questions were or were not properly admissible does not seem to be presented in this case. It is quite clear, however, that the defendant was not prejudiced by the admission of this testimony and that the court committed no reversible error in admitting the same.

[6] It is further contended by the appellant that the court erred in refusing to give the instructions requested on the part of the appellant. These instructions are as follows: "You are instructed * * * that in order to establish a charge by circumstantial evidence it is necessary that the proof should be not only consistent with the defendant's guilt, but inconsistent with his innocence, and if a single material circumstance remains unproved, or, if proven, is inconsistent with the theory of guilt, the crime is not proven with that certainty which the law requires, and you should acquit the defendant, and circumstantial evidence to justify an inference of guilt must exclude to the moral certainty every other reasonable hypothesis. You are instructed * * * that by positive statute in this state 'a conviction cannot be taken upon the testimony of the accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstance thereof. An accomplice is an associate in crime; a partner or partaker in guilt.' You are therefore instructed that if you believe from the evidence that the witness Charles Bowman was an accomplice, as herein defined, then no conviction could be had herein upon his testimony, unless corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and this corroboration is not sufficient if it merely show the commission of the offense, or the circumstance thereof, and if you find that his testimony is not so corroborated, then

you should acquit the defendant. You are instructed * * * that if any one juror entertains a reasonable doubt, as defined in other instructions given herein, as to the guilt of the defendant, then you cannot find him guilty. You are instructed * * * that proof beyond a reasonable doubt is such proof as satisfies the judgment and conscience of the jury, as reasonable men, and applying their reason to the evidence before them, that the crime charged has been committed by the defendant, and so satisfied them as to leave no other reasonable conclusion possible." The court then charged the jury, to which charge of the court, and each portion thereof, the defendant duly execpted.

The court was clearly right in refusing the first instruction, for the reason that but a very small part of the evidence in this case, if any, was circumstantial. The fact that the mare was feloniously taken from the possession of Thompson is clearly established by his testimony and the testimony of Bowman and other witnesses; that the fact that the animal came into the possession of Frank Brandell, one of the parties charged in the indictment, is also clearly established by the evidence in the case; and that the facts connecting the defendant in this action with the larceny were clearly shown by the statements of the defendant himself, made both to Bowman and the witness McIver. The instruction, therefore, upon the question of circumstantial evidence requested was properly refused by the court. People v. Burns, 121 Cal. 529, 53 Pac. 1096; People v. Lonnen, 139 Cal. 634, 73 Pac. 586.

[7] The law as stated in the second instruction was fully covered by the court in its charge to the jury, of its own motion. The court instructed the jury as follows: "I think it is the duty of the court instruct you under the evidence of this case that, if a crime was committed, Charles Bowman was an accomplice, and therefore his testimony would have to be given the particular weight or place in the case provided for by our statute. Our statute provides that a conviction cannot be had upon the testimony of an accomplice, unless 'he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the

commission of the offense or the circumstances thereof.' The statute, as I understand it, means this: That the testimony of an accomplice must not only be corroborated as to the fact that a crime has been committed, but it must be corroborated as to the defendant's connection with it. That is, there must be corroborating evidence to show that the defendant was connected with the commission of the offense."

The third instruction requested was also fully covered by the instructions of the court, of its own motion, in which he charged the jury as follows: "Your verdict must be unanimous, before you can convict the defendant. It would not be sufficient for 9 or 10 or 11 of you to agree, or be satisfied as to his guilt, but all of you and each of you must be satisfied, before you can convict the defendant."

The fourth instruction was fully covered by the charge of the court as to a reasonable doubt, as follows: "If, after a full and fair consideration and comparison of all the evidence, you can truthfully say you have an abiding conviction to a moral certainty of the defendant's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt, but if, after such full and fair comparison of all the evidence, you have not an abiding conviction of the defendant's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs, then you have a reasonable doubt, and should acquit the defendant."

[8] It is contended by the appellant that the court erred in the following instruction to the jury: "I instruct you that in a case of this kind, that where two or more persons enter into a combination or arrangement for the purpose of committing a crime, that each of the persons engaged in that combination is responsible for the acts of all, where those acts lead to the commission of the crime; that each is responsible for the act of the three, and that all are equally liable for the acts of each in that connection." This instruction was clearly correct, and is not susceptible of the construction placed upon it by the appellant. It

will be noticed that the court states it as a general proposition, and commences with the statement, "I instruct you that in a case of this kind," showing that it was intended to be generally applicable to this class of cases, and not to the particular case then before the court.

The court, further along in its charge to the jury, says: "It is for you to say, from all of the evidence in this case, whether or not there was a combination between * * * this defendant and Frank Brandell, Charles Bowman, and George McCarthy. If you become satisfied from the evidence, beyond a reasonable doubt, that this defendant was connected with one or more of these men for the purpose of and commission of a crime, and the crime was committed, I charge you that he was then equally liable with the others."

[9] It is further contended by the appellant that the court erred in the following portion of its charge to the jury: "There can be no presumption to begin with against this defendant. He comes before you clothed with the presumption of innocence." This contention of the appellant that there is a suggestion in this part of the court's charge that some time during the trial, and before the jury are satisfied beyond a reasonable doubt of his guilt, the presumption might be changed to a presumption against the defendant cannot fairly be drawn from the language, and we are of the opinion that there was no material error in this part of the charge.

A similar question was very fully considered and discussed by the Supreme Court of Missouri, in State v. Kennedy, 154 Mo. 268, 55 S. W. 293. That learned court held, after a very full and exhaustive discussion of the subject, that: "Where the court fully and properly instructs the jury on reasonable doubt, its failure to instruct that the defendant is presumed to be innocent, until his guilt is established, does not constitute reversible error, although the defendant had asked the court to give such instruction on the subject of the presumption of innocence." And the court in its opinion says:

"This brings us to the question so earnestly argued in the brief and orally by counsel. It is this: The defendant prayed the

court to given an instruction No. 2, in these words: 'The law presumes the defendant innocent, and this presumption of innocence attends and surrounds him through every stage of the case until the jury shall finally render its verdict.' No doubt, we take it, can longer exist that the presumption of innocence is indulged in favor of every person charged with crime, and that his guilt must be established beyond a reasonable doubt, but the question is, if the court properly and fully instructs the jury on reasonable doubt, will its failure to instruct the jury that the defendant is presumed to be innocent, until his guilt is established, constitute reversible error in and of itself? On the side of the defendant is to be found the Supreme Court of the United States, in Coffin v. United States, 156 U. S. 432 on writ of error to the District Court of United States for Indiana. In an opinion by Justice White, the refusal of an instruction in all respects similar to the one refused in this case was held reversible error. The learned justice traced the history of the presumption of innocence, and drew the distinction between reasonable doubt and the presumption of innocence. As indicating the want of unanimity of judicial opinion, he says, 'The authorities upon this question are few and unsatisfactory.' He cites cases from Texas and Indiana holding it necessary to state to the jury the presumption of innocence, but concedes that in both states statutes required it. In Michigan it has been ruled error to refuse it when asked, but a failure to give it, when not prayed, was not error. People v. Potter, 89 Mich, 353 [50 N. W. 994]; People v. Graney, 91 Mich. 646 [52 N. W. 66]. On the other hand, it has been expressly ruled, after full consideration in Ohio, that it is not error to refuse to charge the presumption of innocence, where the court correctly instructed on the doctrine of reasonable doubt. In Morehead v. State, 34 Ohio St., loc. cit. 217, Judge McIlvaine for the court said: 'Unquestionably the defendant was entitled to the benefit of the legal presumption of his innocence. We think, however, it was given to him. The benefit of the presumption of innocence was fully and practically secured to him in the instruction that the state must prove the material elements of the crime beyond a reasonable doubt.' The Court of Appeapls of Kentucky, also, had

the identical proposition before it in Stevens v. Commonwealth, 45 S. W. 76, and held, just as the Ohio court did, that, while the presumption of innocence might have properly been stated to the jury, he had a full practical benefit in the requirement that his guilt must be established beyond a reasonable doubt. In Alabama and California the presumption of innocence and reasonable doubt are seemingly treated as synonymous. Ogletree v. State, 28 Ala. 693; Moorer v. State, 44 Ala. 15; People v. Lenon, 79 Cal. 625. In this state it has been ruled in at least three cases that it is not reversible error to refuse an instruction stating the presumption of innocence, when the court had fully instructed on the doctrine of reasonable doubt. State v. Young, 105 Mo. 640 [16 S. W. 408]; State v. Harper, 149 Mo. 514 [51 S. W. 89] State v. Heinze, 66 Mo. App. 136. While it is now usual, and we think the proper course, to instruct the jury that the law presumes the innocence of the defendant, and before the jury can convict him they must find him guilty beyond a reasonable doubt, yet, when the court has, as in the this case, fully instructed in his favor on the doctrine of reasonable doubt, and the evidence so abundantly sustains the verdict of the jury, we do not think the sentence should be reversed solely for the failure to state the presumption."

We have quoted quite at length from this opinion, as it reviews the authorities quite fully bearing upon this subject, and we may add that the part of the decision which we have quoted is quoted in a note in Brickwood's Sackett, Instructions, pp. 1695, 1696, with apparent approval

[10] It will be noticed in that case that an instruction upon the subject was requested by the counsel for the defendant. In the case at bar no such instruction was requested, and while, undoubtedly, it would be the better practice for the trial court to give substantially such an instruction as was requested by counsel in the case from which we have quoted, still in view of the decisions we think the failure to give such an instruction, when not requested, does not constitute reversible error, especially as the court in this case very fully charged the jury that they must be satisfied of the guilt of the defendant beyond a reasonable doubt.

There are other errors assigned which have been considered by the court, but, in our opinion, they do not possess sufficient merit to require a separate discussion.

Finding no error in the record, the judgment of the circuit court and order denying a new trial are affirmed.