**Larry Junior WEBSTER,
Petitioner–Appellee,**

v.

**Jeanne S. WOODFORD, Warden,
at San Quentin California State
Prison, Respondent–Appellant.**

**No. 02–99009.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 2003.

Filed March 5, 2004.

Amended May 25, 2004.

Opinion, 361 F.3d 522, superseded.

Patrick J. Whalen, Stan Cross, Jo Graves, and Robert Anderson, Office of the Attorney General of the State of California, Sacramento, CA, for the appellant.

James S. Thomson and Saor E. Stetler, Thomson & Stetler, Berkeley, California; and Joseph Sclesinger, Assistant Federal Defender, and Quinn Denvir, Federal Defendant, Sacramento, CA, for the appellee.

Before: SCHROEDER, Chief Judge, and THOMAS and CLIFTON, Circuit Judges.

## ORDER

The opinion in this case, which was filed March 5, 2004, 361 F.3d 522, is amended as follows:

On page 531, "In the instant case, it is undisputed that Webster removed the keys to the automobile from the victim's pocket." is replaced by, "In the instant case, the State proved beyond a reasonable doubt that Webster removed the keys to the automobile from the victim's person."

"Further, California had also long held that constructive possession of property by the victim was sufficient to meet the requirements of the robbery statute." is replaced by, "Further, California had also long held that constructive possession of property by the victim was sufficient to meet the possession requirement of the robbery statute."

With the amendments, the petition for rehearing and rehearing en banc are denied.

## OPINION

THOMAS, Circuit Judge.

This appeal requires us to decide, *inter alia*, whether Larry Webster's due process rights were denied by a judicial expansion of California's definition of death-qualifying special circumstances in violation of *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). We hold that they were not and reverse the judgment of the district court.

### I

This is a capital case arising out of the murder of William Burke. In late August, 1981, Larry Junior Webster was camping near Sacramento with five associates. Several members of the group had robbed a convenience store the previous night, and the group was aware that the police were looking for them. Webster stated that the group needed to get out of town to avoid the police, and suggested luring one of two persons he had met at a nearby gas station to the campsite, killing him, and stealing his car. They planned for Webster and two others in the group—Carl Williams and Joseph Madrigal—to lure the victim back to the camp with the promise of drugs or participating in robberies. The others were to dig a grave and clean up the campsite.

At the gas station, Webster, Williams, and Madrigal approached the victim, Burke, and suggested they go to the State

Fair to sell drugs. Burke agreed with this suggestion and borrowed his cousin's car. The four men then drove back to the campsite. Because the campsite was by a creek some distance below the road, they had to park the car in a lot about a quarter-mile from the site. The two associates who had been waiting at the campsite heard Webster yell, "We're back" from up on a levee. They saw the four men coming down a trail from the levee to the campsite: Williams was in the lead, Madrigal behind, followed by Burke, and finally Webster. Midway down the trail, Webster grabbed Burke from behind, pushed him down the trail, moved in front of him, then stabbed him to death with a buck knife. The group left in Burke's car, and was eventually stopped for a traffic violation, leading to their arrest.

A California jury convicted Webster of first degree murder, robbery, conspiracy to commit first degree murder and robbery, and grand theft of an automobile. The conviction of murder in the first degree was predicated on both a finding of premeditation and the felony murder rule. The jury found two special circumstances making the murder death penalty eligible: murder during the commission of a robbery and murder while lying in wait. After a penalty phase of the trial, the jury sentenced Webster to death.

The California Supreme Court affirmed his sentence. *People v. Webster*, 54 Cal.3d 411, 285 Cal.Rptr. 31, 814 P.2d 1273 (1991). After his petition for writ of certiorari to the United States Supreme Court was denied, *Webster v. California*, 503 U.S. 1009, 112 S.Ct. 1772, 118 L.Ed.2d 431 (1992), Webster filed a petition for writ of habeas corpus in federal court. The district court determined that retroactive application of the California Supreme Court's construction of the two special circumstances found by the jury violated Webster's right to due process and therefore warranted invalidation of his death sentence, both special circumstances, and his murder conviction. The court entered partial final judgment under Fed. R.App. P. 54(b) with respect to these two claims, staying adjudication of Webster's other claims to await the outcome of this appeal. The district court's grant of partial final judgment under Fed. R.App. P. 54(b) was appropriate in order to promote judicial economy and conduct a single evidentiary hearing if one should become appropriate. We therefore have jurisdiction under 28 U.S.C. § 2254.

■ The substantive review standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA") do not apply to Webster's petition because he filed his habeas petition in 1993, before the enactment of AEDPA. *Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1494 (9th Cir.1997) (en banc). Under pre-AEDPA standards, we review the judgment of the district court on issues of law *de novo*. *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir.2001).

## II

The central issue in this case is whether the construction of the special circumstance elements constituted an impermissible retroactive judicial modification of the law in violation of *Bouie*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894.

The *Ex Post Facto* clauses of the United States Constitution prohibit the states and the federal government from passing criminal or penal statutes that have a retroactive effect. U.S. Const. art. I, § 9, cl. 3; *id.* art. I, § 10, cl. 1. The *Ex Post Facto* clauses do not, by their terms, include the judiciary, and the Supreme Court has never extended the *Ex Post Facto* clauses to judicial acts. *See, e.g., Frank v. Mangum,*

237 U.S. 309, 344, 35 S.Ct. 582, 59 L.Ed. 969 (1915).

■ However, in *Bouie*, the Supreme Court held that a judicial construction of a criminal statute encompassing conduct not previously addressed by the statute can violate the Due Process Clause. 378 U.S. at 353–54, 84 S.Ct. 1697. Thus, as the Court stated:

If a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect.

*Id.* at 354, 84 S.Ct. 1697 (quoting Hall, *General Principles of Criminal Law* (2d ed.1960), at 61).

At issue in this case are two aspects of the special circumstances which the jury found true beyond a reasonable doubt: (1) the "immediate presence" element of robbery and (2) what constituted "lying in wait for murder." Webster argues that the California Supreme Court's construction of these elements was not foreseeable. Thus, he contends that the jury entered its verdict of special circumstances in violation of *Bouie* and *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

### A

■ The State urges us to hold that the district court's interpretation and application of *Bouie* to the instant case constitutes a new rule of criminal procedure in

violation of *Teague v. Lane*, 489 U.S. 288, 308–310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). In essence, the State argues that *Teague* precludes us from applying a due process restriction on retroactive application of substantive criminal statutes retroactively. This argument was not presented to the district court. Therefore, the State has waived the issue, and we need not reach it unless we exercise our discretion to so do. *Garceau v. Woodford*, 281 F.3d 919, 919–20 (9th Cir.2002), *rev'd. on other grounds*, 538 U.S. 202, 210, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003); *United States v. Navarro*, 160 F.3d 1254, 1256 (9th Cir.1998); *Duckett v. Godinez*, 67 F.3d 734, 746 n. 6 (9th Cir.1995).[1]

■ Although we need not reach the issue, we elect to exercise our discretion to do so in this instance because this is an interlocutory appeal. The State could easily rectify its error by raising the issue before the district court on remand. Thus, judicial economy is served by addressing the *Teague* argument in this appeal.

■ One of the threshold questions to a *Teague* analysis is whether the proposed rule is substantive or procedural because, as the Supreme Court has noted, "*Teague* by its terms applies only to procedural rules." *Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). As applied in this context, the *Bouie* rule is unquestionably substantive. As the Court explained in *Bouie*:

---

**1.** The State argues that "if the state does argue that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague*," quoting *Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). However, this obligation only arises if a *Teague* argument is "properly raised by the state." *Horn v. Banks*, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002). The rule of *Teague* is not jurisdictional. *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715,

111 L.Ed.2d 30 (1990). Courts are not obligated to consider a *Teague* argument *sua sponte*. *Id.* Nor are courts obliged to consider it when raised for the first time on appeal. *See, e.g.*, *Schiro v. Farley*, 510 U.S. 222, 229, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (declining to address the State's *Teague* argument, which was not presented to the district or circuit courts); *Godinez v. Moran*, 509 U.S. 389, 397 n. 8, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (same).

[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a crime, or makes it *greater* than it was, when committed.' *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.

378 U.S. at 353–54, 84 S.Ct. 1697 (emphasis in original) (footnote omitted).

■ As we recently noted, "[d]ecisions of substantive criminal law [ ] are those that reach beyond issues of procedural function and address the meaning, scope, and application of substantive criminal statutes." *Summerlin v. Stewart*, 341 F.3d 1082, 1100 (9th Cir.2003) (en banc) (internal quotation marks omitted). In short, "for *Teague* purposes, a new rule is one of 'procedure' if it impacts the operation of the criminal trial process, and a

new rule is one of 'substance' if it alters the scope or modifies the applicability of a substantive criminal statute." *Id.* (citing *Bousley*, 523 U.S. at 620, 118 S.Ct. 1604).

■ In this case, Webster contends that the California Supreme Court altered the meaning of the substantive state criminal statutes, resulting in an imposition of additional criminal liability. When a court decision affects the interpretation of elements of a crime, its decision is substantive rather than procedural under *Teague*. See *United States v. Montalvo*, 331 F.3d 1052, 1056 (9th Cir.2003). Special circumstances that make a criminal defendant eligible for the death penalty operate as " 'the functional equivalent of an element of a greater offense.' " *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494, n. 19, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)); *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 111, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) ("Put simply, if the existence of any fact (other than a prior conviction) increases the maximum punishment that may be imposed on a defendant, that fact—no matter how the State labels it—constitutes an element, and must be found by a jury beyond a reasonable doubt.").[2]

**2.** Like Arizona's aggravating circumstances, California's special circumstances were originally enacted in order to comply with *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and narrow the scope of murders eligible for the death penalty, *People v. Green*, 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468, 497 (1980), after the death penalty scheme had twice been struck down as unconstitutional, *see Rockwell v. Superior Court*, 18 Cal.3d 420, 134 Cal.Rptr. 650, 556 P.2d 1101, 1116 (1976); *People v. Anderson*, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880, 883 (Cal.1972). In the absence of these "several enumerated special circumstances ... murder, no matter how willful, deliberate and

premeditated, was a noncapital offense." *Green*, 164 Cal.Rptr. 1, 609 P.2d at 497.

Death penalty eligibility under California's special circumstances must be shown at trial; the jury must find the presence of these factors beyond a reasonable doubt, just as it would elements of a crime. Cal.Penal Code § 190.4. Indeed, many of these circumstances are themselves substantive crimes or elements of substantive crimes, such as robbery, lying in wait murder, use of a destructive device or bomb, carjacking, arson, kidnapping, rape, sodomy, and train wrecking. Cal.Penal Code § 190.2. While some of the circumstances may seem more akin to traditional sentencing factors, for example prior conviction of first or second degree murder, *all* must be found

Under *Bouie,* when a state court by judicial construction unforeseeably and unexpectedly broadens the scope of the elements of a crime, this unconstitutional expansion of the criminal law is invalid with respect to any acts committed prior to the judicial holding. In short, *Bouie* is not one of "those decisions that implicate how the criminal trial process functions," and therefore classified as a procedural decision under *Teague. Summerlin,* 341 F.3d at 1100. Rather, application of *Bouie* doctrine necessarily is a decision affecting substantive criminal law because it operates as a constitutional restriction on the reach of a judicial construction. Thus, *Teague* does not bar the retroactive application of *Bouie* to new situations.

Moreover, even if it were necessary to reach the question of whether the district court's application of *Bouie* to California's special circumstances was "dictated by precedent existing at the time [Webster's] conviction became final," *Teague,* 489 U.S. at 301, 109 S.Ct. 1060, we would hold that it was. Although *Bouie* does not apply to sentencing schemes, *e.g., United States v. Newman,* 203 F.3d 700, 702 (9th Cir.2000); *United States v. Ricardo,* 78 F.3d 1411, 1416 n. 11 (9th Cir.1996); *United States v. Ruiz,* 935 F.2d 1033, 1036 (9th Cir.1991), it was well-established at the time Webster's state conviction became final in 1992 that *Bouie* does apply to judicial constructions of substantive elements of criminal law such as aggravating circumstances. *E.g., Oxborrow v. Eikenberry,* 877 F.2d 1395 (9th Cir.1989); *Knapp v. Cardwell,* 667 F.2d 1253 (9th Cir.1982). As we have explained, California's special circumstances statute unarguably defines the unique elements of capital murder that distinguish it from other first degree mur-

der, in conformance with *Furman.* It is not a mere sentencing scheme, and therefore, application of *Bouie* to the statute was clearly required as of 1992. Indeed, California has long applied *Bouie* to its special circumstances statute, and did so in this very case. *People v. Webster,* 54 Cal.3d 411, 285 Cal.Rptr. 31, 814 P.2d 1273, 1294 n. 21 (1991); *see, e.g., People v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290, 330 (1991); *People v. Poggi,* 45 Cal.3d 306, 246 Cal.Rptr. 886, 753 P.2d 1082, 1094 (1988); *People v. Weidert,* 39 Cal.3d 836, 218 Cal.Rptr. 57, 705 P.2d 380, 388 (1985).

For these reasons, we conclude *Teague* does not apply to preclude Webster from asserting the application of *Bouie* to this case.

B

The touchstone of the *Bouie* doctrine is that due process protects against judicial infringement of the right to fair warning that certain conduct will give rise to criminal penalties. *Marks,* 430 U.S. at 191–92, 97 S.Ct. 990. Thus, *Bouie* is not violated unless the judicial construction of the criminal statute represents a "radical and unforeseen departure from former law." *Hayes v. Woodford,* 301 F.3d 1054, 1088 (9th Cir.2002).

The beginning point for a *Bouie* analysis is the statutory language at issue, its legislative history, and judicial constructions of the statute. In *Bouie,* for example, the Supreme Court found an impermissible retroactive expansion of the law because the judicial construction "was so clearly at odds with the statute's plain language and had no support in prior South Carolina decisions." *Rogers v. Tennessee,* 532 U.S.

---

beyond a reasonable doubt by a unanimous jury in order to make a defendant's crimes eligible for the death penalty. Cal.Penal Code

§ 190.4. Thus, they can only be understood as substantive elements of capital murder as opposed to mere penalty enhancements.

451, 458, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001).

■ In addition, a court may examine the trend of judicial constructions of similar statutes by other States. Of course, as the Supreme Court noted in *Bouie*, "[i]t would be a rare situation in which the meaning of a statute of another State sufficed to afford a person 'fair warning' that his own State's statute meant something quite different from what its words said." 378 U.S. at 359–60, 84 S.Ct. 1697. However, when a "rule has been legislatively or judicially abolished in the vast majority of jurisdictions recently to have addressed the issue," then the judicial construction may not be unexpected. *Rogers*, 532 U.S. at 463, 121 S.Ct. 1693. As the Supreme Court noted in *Rogers*, "the fact that a vast number of jurisdictions have abolished a rule that has so clearly outlived its purpose is surely relevant to whether the abolition of the rule in a particular case can be said to be unexpected and indefensible by reference to the law as it then existed." *Id.* at 464, 121 S.Ct. 1693. This consideration is most relevant when assessing a change in the common law, as was the case in *Rogers*, rather than in a case of pure statutory construction.

In this case, we are reviewing specific California statutes, with a long history of California judicial construction and few, if any, specific statutory counterparts in other jurisdictions. Thus, it is appropriate to confine our examination to California law. In doing so, we give primacy to controlling decisions of the California Supreme Court, but also must consider intermediate appellate court rulings to the extent they offer predictive value in determining whether a particular construction was unexpected or unforeseen.

## C

■ The district court held that the California Supreme Court's construction of the "immediate presence" element of robbery violated *Bouie* because it was unforeseeable at the time of Webster's crimes, on August 30, 1981. Robbery is defined in California as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal.Penal Code § 211.

Webster argues that the theft of the car, which was the primary focus of the proof, did not occur in the "immediate presence" of his victim and that no judicial construction of the phrase put him on notice that the courts would consider taking property a quarter mile away as being within a victim's "immediate presence." In Webster's direct appeal, the California Supreme Court held that a finding of robbery under this theory was legitimate because the meaning of "immediate presence" under California law is broader than the ordinary meaning of the term and included the conduct at issue in Webster's case. Thus, we must consider whether this interpretation of California's robbery statute was unforeseeable by a person of ordinary intelligence in 1981, and therefore retroactively applied in violation of Webster's due process rights. In doing so, we are mindful that "[t]he principle underlying *Bouie* and the later cases is that due process forbids the imposition of criminal penalties against a defendant who had no fair warning that his conduct violated the law." *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir.1987).

At trial, the jury was given the standard California robbery instruction, which provided in relevant part that:

The crime of robbery is the taking of personal property in the possession of another from his person or immediate

presence, and against his will, accomplished by means of force or fear and with the specific intent permanently to deprive such person of the property. In order to prove the commission of the crime of robbery, each of the following elements must be proved: One, that a person had possession of property of some value, however slight; two, that such property was taken from such person or from his immediate presence; three, that such property was taken against the will of such person; four, that the taking was accomplished by fear or intimidation or by both; and five, that such property was taken with the specific intent permanently to deprive such person of the property.

In assessing the robbery instruction given at trial and the state of judicial construction of California's robbery statute, we cannot say that the California Supreme Court's decision in Webster's direct appeal was a "radical and unforeseen departure from former law," *Hayes*, 301 F.3d at 1088, or that it so altered the substantive law of robbery in California that it denied Webster fair notice that his actions would constitute the crime of robbery.

First, California had previously interpreted the phrase "immediate presence" to include situations in which the taking was outside the victim's sensory perception. The first significant case leading to this interpretation is *People v. Lavender*, 137 Cal.App. 582, 31 P.2d 439 (1934). In *Lavender*, the defendant and his accomplice induced a hotel clerk to show them a room, then bound and gagged him, and returned to the office where they removed money from the cash drawer. The defendant challenged his robbery conviction based on a failure to satisfy the "immediate presence" requirement. However, the California Supreme Court adopted an expansive interpretation of the phrase, noting that

"the meaning of the word 'presence' depends on the circumstances of each particular case." 31 P.2d at 440. The Court then surveyed cases from across the country, and cited with approval a Missouri case, *State v. Kennedy*, 154 Mo. 268, 55 S.W. 293 (1900), involving a separation of victim from property by approximately a quarter mile—the very distance involved in the instant case. 31 P.2d at 441. In *Lavender*, the Court also adopted an expansive interpretation of the word "immediate," holding that the clerk was "constructively 'immediately' present" at the scene of the theft, even though the clerk was some distance away. *Id.* at 442.

Similarly, in *People v. Hornes*, 168 Cal. App.2d 314, 335 P.2d 756 (1959), the California Supreme Court upheld a robbery conviction in which a gas station attendant was removed from the station at gunpoint before property was taken. *Id.* at 758. The Court noted:

> Appellants' claim that the property was not taken from the 'immediate presence' of the victim is equally untenable. *Although the station attendant was unable to view the actual taking, or sense it in any way, the court below was entitled to conclude from the evidence that appellants sought to facilitate their crime by removing the victim some 100 yards from the scene.*

*Id.* at 760.

The Court specifically rejected the idea that the fact that a device was used to separate the person from the property to be taken would allow the defendant to claim that "the property was not taken from the 'immediate presence' of the victim." *Id.*

Given these cases, the California Supreme Court's interpretation of "immediate presence" was not so unforeseen or unexpected that it constituted an imper-

missible modification of substantive criminal law in violation of *Bowie*.[3]

Second, given the robbery instruction given at the trial as a whole, which comported with then-extant California law, it is quite apparent that Webster had fair notice that he was committing the crime of robbery. The jury was instructed that the crime of robbery was committed when "property of some value, however, slight" was taken from the victim "or from his immediate presence." California courts had long adhered to the rule that "robbery does not depend upon the value of the property taken" and that even property of "slight value" was sufficient to satisfy the elements of the crime. *People v. Simmons*, 28 Cal.2d 699, 172 P.2d 18, 21 (1946) (quoting *People v. Thomas*, 45 Cal.App.2d 128, 113 P.2d 706, 710 (1941)). In *Simmons*, the property at issue consisted of a package of cigarettes. In the instant case, the State proved beyond a reasonable doubt that Webster removed the keys to the automobile from the victim's person. Given the California Supreme Court's holding that "an item of personal property has some value" with the amount of value being "immaterial" in order to sustain a robbery conviction, *id.*, Webster clearly had fair notice that his actions in taking the keys alone would satisfy the "immediate presence" requirement of the robbery statute.

Further, California had also long held that constructive possession of property by the victim was sufficient to meet the possession requirement of the robbery statute. The jury in this case was instructed that a robbery could occur when the victim was in constructive possession of the property at issue. This comported with prior California case law in which the courts had affirmed robbery convictions when the victims, such as security guards, were not physically present where the robbery occurred and had no actual possession of the property taken. *See, e.g., People v. Miller*, 18 Cal.3d 873, 135 Cal.Rptr. 654, 558 P.2d 552, 557 (1977) (In Bank).

In this case, the victim clearly had constructive possession of the car at the time he was attacked by virtue of having the keys to the vehicle. It was the constructive possession that Webster desired to take—if the keys had been left in the car, the conspirators could simply have taken it.

In short, the California Supreme Court's construction of the immediate presence requirement was not so unforeseen or unexpected that it constituted an impermissible modification of the elements of robbery and, in any case, Webster had fair notice that his actions constituted criminal robbery. Thus, there was no violation of *Bowie* in the application of the robbery instruction in this case.

---

**3.** In addition, the "immediate presence" element of robbery has been construed, over the years, to cover a variety of conduct that does not necessarily come within the ordinary understanding of the terms "immediate presence." Many states at the time of Webster's conduct in 1981 used a "but for" test of "presence" or "immediate presence": An object was in a victim's "presence" if, but for the use of force or threat of force, the victim could have retained possession over it. *E.g., People v. Bartowsheski*, 661 P.2d 235 (Colo. 1983); *State v. Glymph*, 222 Kan. 73, 563 P.2d 422 (1977); *Fields v. State*, 364 P.2d 723 (Okla.Crim.App.1961); *Commonwealth v. Homer*, 235 Mass. 526, 127 N.E. 517 (1920). Said in other words, immediate presence meant "an area over which the victim, at the time the force or fear was employed, could be said to exercise some physical control." *See People v. Hayes*, 52 Cal.3d 577, 276 Cal.Rptr. 874, 802 P.2d 376, 407 (1990). Indeed, California itself adopted these tests explicitly in *Hayes*, 276 Cal.Rptr. 874, 802 P.2d at 407, after Webster's offenses. Under this but for test, an object could be in a victim's immediate presence although it was in another room, or parked outside his home.

D

The district court also held that the California Supreme Court's conclusion that a jury could find the special circumstance of "lying in wait" in the absence of physical concealment was an unforeseen expansion of the statutory elements in violation of *Bouie*. In California, a finding of murder while lying in wait requires three elements: concealment, watching, and waiting. The California Supreme Court applied *People v. Morales*, 48 Cal.3d 527, 257 Cal.Rptr. 64, 770 P.2d 244 (1989), a post–1981 case interpreting lying in wait, *id.* at 258–61, 257 Cal.Rptr. 64, 48 Cal.3d 527, to Webster. Under *Morales*, the "concealment" element of lying in wait can be satisfied by a defendant's "concealment of purpose" even when there is no attempted or actual physical concealment involved. At Webster's trial, the jury was provided with the following definition of "lying in wait" by the Court:

> a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise.

Given this instruction, especially in light of the prosecutor's theory of the case, the jury could have found lying in wait on a theory of watching, waiting, and a secretive plan, in the absence of any physical concealment. The California Supreme Court held that *Morales* was not an unforeseeable change in California law. *Webster*, 285 Cal.Rptr. 31, 814 P.2d at 1294 n. 21. The district court held that *Morales* was an unforeseeable change in violation of Webster's due process.

It is true that the California Supreme Court consistently applied "lying in wait" before 1981 to cases in which the defendant physically concealed him or herself for some period of time before attacking the victim. For example, *People v. Harrison* stated:

The law is established that lying in wait is sufficiently shown by proof of concealment and watchful waiting. . . . From the evidence that defendant had armed himself with a butcher knife, that he was not observed on the street prior to the attack, and that he attacked Mrs. Martin immediately upon her emergence from the apartment house, the jury could reasonably conclude that he was waiting for her with the intention of killing or inflicting injury upon her, and that the killing was accomplished by the means of his watching and waiting in concealment.

59 Cal.2d 622, 30 Cal.Rptr. 841, 381 P.2d 665, 670 (1963). *See also People v. Rosoto*, 58 Cal.2d 304, 23 Cal.Rptr. 779, 373 P.2d 867, 894 (1962) ("The jury could reasonably have inferred the killer was in hiding and was waiting for the Simpsons, since no one saw him before the murder, and his approach to Simpson coincided with the latter's approach to the front porch."); *People v. Atchley* 53 Cal.2d 160, 346 P.2d 764, 772–73 (1959); *People v. Byrd*, 42 Cal.2d 200, 266 P.2d 505, 509 (1954); *People v. Bernard*, 28 Cal.2d 207, 169 P.2d 636 (1946); *People v. Vukich*, 201 Cal. 290, 257 P. 46 (1927); *People v. Miles*, 55 Cal. 207 (1880). The defendant's concealment could be unsuccessful; the victim could have seen the defendant during the whole attempted concealment. However, the courts explained that "[t]he gist of 'lying in wait' is that the person places himself in a position where he is waiting and watching and concealed from the person killed." *People v. Thomas*, 41 Cal.2d 470, 261 P.2d 1, 3 (1953).

Nevertheless, several California Supreme Court cases prior to 1981 substituted the term "secrecy" for "concealment." *E.g., People v. Sutic*, 41 Cal.2d 483, 261 P.2d 241, 246 (1953); *People v. Tuthill*, 31 Cal.2d 92, 187 P.2d 16, 21 (1947). Indeed,

the language of the jury instructions given in this case was quoted with approval in *People v. Atchley,* 53 Cal.2d 160, 346 P.2d 764, 772 n. 4 (1959) ("To constitute lying in wait, ... a person's conduct ... must involve ... a waiting and watching for an opportune time to do the act, and also either a concealment in ambush or some other secrecy of design to take the other person by surprise.").

Although even the cases in which the term "secrecy" was used—*Tuthill, Sutic,* and *Atchley*—involved attempted physical concealment or attempted secret presence for some period of time before the murder, the fairest reading of the term "secrecy" is that it contemplates concealment of purpose, along with watching and waiting, as satisfying the definition of lying in wait. This is because lying in wait originated in California as a means of presuming the premeditation necessary for a finding of first-degree murder. *See Domino v. Superior Court,* 129 Cal.App.3d 1000, 181 Cal.Rptr. 486, 490–91 (1982). Indeed, almost all of the cases interpreting it arise in that context, since it only acquired the additional role of a special circumstance under California's death penalty scheme in 1978, *see id.* at 490, three years before Webster's offenses. When "watching, waiting, and concealment" are understood as factors giving rise to a presumption of premeditation, then construing "concealment" to include "concealment of purpose" or general "secrecy of design" is both foreseeable and sensible. Concealment of purpose would indicate premeditation just as clearly as physical hiding would. Clarifying this issue in the context of an almost

identical debate, one California appellate court stated:

Defendant's argument is that lying in wait requires the elements of watching, waiting, and *concealment* ... The People argue that the elements are watching, waiting and *secrecy* and that concealment is not a necessary element. ... The discrepancy between the two positions is purely semantic. ... The confusion between the two positions stems from an improper appreciation of the nature of the "concealment" which is required for the lying in wait theory to be applicable. ... It is clear that while concealment is an element necessary before lying in wait can be applied, it is only a concealment which puts the defendant in a position of advantage from which the fact finder can infer that lying in wait was part of the defendant's plan to take his victim by surprise. Such conduct is ample to show that a deliberate and premeditated murder was contemplated and to take the place of direct proof on that subject.

*People v. Ward,* 27 Cal.App.3d 218, 103 Cal.Rptr. 671, 678–79 (1972) (citations, footnotes, and internal quotation marks omitted) (alterations in original).

Thus, the true issue is whether it was foreseeable, as of 1981, that California courts would import the definition of concealment used in the context of presuming first degree murder into the definition of the lying in wait special circumstance. Importing this definition from one provision of law to another was not a "radical and unforeseen departure from former law." *Hayes v. Woodford,* 301 F.3d at 1088.[4]

---

4. Complicating the matter is that post–1981, in *Richards,* a California appellate court stated that the "concealment" element of the lying in wait special circumstance did require some sort of physical concealment. *Richards v. Superior Court,* 146 Cal.App.3d 306, 194 Cal.Rptr. 120, 125 (1983). But in *Morales,* the California Supreme Court overruled this portion of *Richards,* and maintained that "concealment" included "concealment of purpose." The state characterizes this sequence of events as the *Richards* court devi-

Aside from an examination of California precedent, one of the strongest indications that "secrecy" had supplanted "concealment" in the theory of "lying in wait" is that the official California Jury Instructions had adopted the definition at the time of Webster's trial. The standard "lying in wait" jury instruction was developed by the Committee on Standard Jury Instructions of the Superior Court of Los Angeles County. In developing the instructions, the Committee was guided by the philosophy that an instruction should be (1) "an accurate statement of the law," (2) "as brief and concise as practicable," (3) "understandable to the average juror," and (4) "completely neutral, unslanted and free of argument." Comm. on Standard Jury Instructions, *California Jury Instructions Criminal* vii. (Philip H. Richards ed., 4th rev. ed.1979). The standard instruction, which was given in Webster's case, stated in relevant part:

> The term "lying in wait" is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise.

*Id.* 263. *See also id.* 324.

This definition, which was approved as a correct statement of California law in *People v. Benjamin,* 52 Cal.App.3d 63, 124 Cal.Rptr. 799 (1975), allowed for proving the special circumstance by showing that the perpetrator had used a "secret design" as a means of concealment, as an alternative to physical concealment. Given the

existence and wide publication of this standard instruction, it was foreseeable that it would be applied.

Additionally, when the California Supreme Court determined that evidence at trial was sufficient to support watching and waiting, its holding was not unforeseeable, because it rested on testimony at trial that Webster walked behind Burke the entire time they proceeded down the trail from the levee to the campsite, up until the moment of attack. For all of these reasons, we conclude that the California Supreme Court's express adoption of the theory in *Morales* was not an unforeseen or unexpected radical modification of substantive criminal law in violation of *Bouie.*

### III

In sum, we hold that *Teague* does not preclude the application of *Bouie* under these circumstances, but that the California Supreme Court's construction of the elements of robbery and lying in wait did not violate *Bouie.*

**REVERSED AND REMANDED.**

---

ating from correct California law, and the *Morales* court later correcting the mistake. Under this reading, since both cases postdate Webster's offenses, *Morales* would simply represent a foreseeable pre–1981 California view of lying in wait, and its application to Webster would not conflict with due process. This is certainly how the *Morales* court characterized its own work. Determining

whether this expansion is unforeseeable is a matter of federal due process law, rather than an inquiry into what narrative form a state court employs in its rulings. Nevertheless, it does seem foreseeable as of 1981 given *Atchley, Sutic, Tuthill,* and *Ward* that concealment might be construed as other than physical concealment.