**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAL COBURN BROWN,
              *Petitioner-Appellant,*

              v.

JOHN LAMBERT, Superintendent of
Washington State Penitentiary,
              *Respondent-Appellee.*

No. 04-35998

D.C. No.
CV-01-00715-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief Judge, Presiding

Argued and Submitted
July 14, 2005—Pasadena, California

Filed December 8, 2005

Before: Stephen Reinhardt, Alex Kozinski and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Kozinski

## COUNSEL

Suzanne Elliott and Gilbert H. Levy, Seattle, Washington, for the petitioner-appellant.

Rob McKenna, Attorney General, and John J. Samson, Assistant Attorney General, Criminal Justice Division, Olympia, Washington, for the respondent-appellee.

## OPINION

KOZINSKI, Circuit Judge:

We consider the exclusion of jurors for cause in a death penalty case.

### Facts[1]

Cal Brown is not a nice man. In May 1991, he carjacked Holly Washa and drove her to a motel near the Seattle-Tacoma airport. Brown robbed, raped and tortured Washa while holding her hostage for two days. He bound and gagged

---

[1]For a more detailed discussion of the facts, see the Washington Supreme Court's opinion in Brown's direct appeal, *State* v. *Brown*, 940 P.2d 546, 555-59 (Wash. 1997) (en banc).

her, penetrated her with foreign objects, whipped her and shocked her with an electrical cord. Eventually, Brown put Washa in the trunk of her car, slit her throat, stabbed her and left her to bleed to death in a parking lot.

Brown then flew to Palm Springs, California, to rendezvous with his next victim, Susan Schnell, whom he had met on an airplane a few days earlier. While inside their hotel room, Brown similarly robbed and raped Schnell, bound and gagged her, tortured and penetrated her. After handcuffing Schnell to the bed, Brown slit her throat and left her to die. Amazingly, Schnell was able to call the front desk and summon the police, who arrived and arrested Brown in the hotel parking lot.

Brown quickly confessed to both the rape and attempted murder of Schnell in California, and the rape and murder of Washa in Washington. After pleading guilty in California and receiving a sentence of life imprisonment, Brown was tried in Washington. A jury convicted Brown of aggravated first-degree murder, and sentenced him to death. Brown exhausted his direct appeals and state habeas proceedings. He then petitioned for a writ of habeas corpus in federal court, raising a number of constitutional claims regarding his trial and sentencing.[2] The district court denied his petition after an evidentiary hearing, and Brown appeals three issues relating to his death sentence.[3]

---

[2]Because Brown filed his habeas petition after April 23, 1996, we apply the "substantive review standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ('AEDPA')." *Webster* v. *Woodford*, 369 F.3d 1062, 1066 (9th Cir.), *cert. denied*, 125 S. Ct. 626 (2004); *see also Lindh* v. *Murphy*, 521 U.S. 320, 327 (1997).

[3]In his "Statement of Issues," Brown also asks whether his "*conviction* [was] obtained in violation of the Due Process Clause of the Fourteenth Amendment . . . ." (Emphasis added.) But the claims Brown raises in the remainder of his brief relate only to his death sentence, not his conviction. Thus, we will consider only whether Brown is entitled to habeas relief with respect to his death sentence. *See Am. Int'l Enters.* v. *FDIC*, 3 F.3d 1263, 1266 n.5 (9th Cir. 1993) (holding that an issue mentioned in a statement of issues, but not addressed in the argument section of the brief, may be considered abandoned).

### Facial Validity of Washington's Death Penalty Statute

Brown challenges the constitutionality of the Washington death penalty statute on its face, arguing that it gives the jury no guidance on how to consider evidence of collateral crimes.

[1] The Washington death penalty statute requires the jury to deliberate on one question only: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" Wash. Rev. Code § 10.95.060(4); *see also id.* § 10.95.070 (setting forth a non-exhaustive list of factors the jury may consider). We have previously upheld the facial validity of the identical Washington statute against a challenge that it "fails to adequately channel and guide jury sentencing discretion." *Campbell* v. *Kincheloe*, 829 F.2d 1453, 1464 (9th Cir. 1987) ("*Campbell I*"). In *Campbell I*, we viewed the statute in light of the construction given to it by the Washington Supreme Court, *see State* v. *Bartholomew*, 683 P.2d 1079, 1086-87 (Wash. 1984) (en banc), and held that the defendant's facial challenge was "meritless." *See Campbell I*, 829 F.2d at 1464; *see also Campbell* v. *Blodgett*, 978 F.2d 1502, 1513-14 (9th Cir. 1992) (per curiam) ("*Campbell II*").

[2] Brown's argument in this case is merely a subset of Campbell's facial challenge; he claims that the statute fails to adequately channel and guide jury sentencing discretion *with respect to evidence of collateral convictions*. Thus, our broader holding in *Campbell I*—that the Washington statute does not fail to adequately guide jury discretion with respect to *anything*—necessarily precludes Brown's claim. We have no occasion to reevaluate our earlier assessment of the statute. *See Barapind* v. *Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (per curiam) (noting that rulings by three-judge panels are "law of the circuit," and are binding on subsequent three-judge panels).

## Jury Selection

Brown next argues that three prospective jurors were erroneously dismissed for cause, and that he was therefore sentenced by a "tribunal organized to return a verdict of death." *Witherspoon* v. *Illinois*, 391 U.S. 510, 521 (1968).

**[3] 1.** Juror X was uncertain whether she would be able to impose the death penalty. Though she initially professed a willingness to follow the court's instructions, she later expressed serious reservations: "Oh, yeah, I could follow the instructions. I think that—actually making that decision, no." When the court asked her about her ability to vote for death, she responded, "I don't think I could. It would have to be so crystal clear. I would have to be—." Based on these responses, the trial judge properly excused X for cause, finding that her views on the death penalty would "substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and oath." *Wainwright* v. *Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)) (internal quotation mark omitted).

**[4]** Juror Y's voir dire exposed even stronger antipathy toward the death penalty, bordering on moral outrage. She described the death penalty as "barbaric" and suggested that it "makes . . . brutes of us all." She expressed resentment toward the state of Washington for putting her in the position of choosing between life and death. Finally, when asked by the court if she would be able to consider sentencing anyone to death, Y "crossed her arms, held her hand up . . . and sat back."[4] The trial judge properly excused juror Y for cause as well, noting that her impairment was "obvious."

---

[4]It is unclear from the record how Y "held her hand up." Presumably, she was holding her hand up with her palm out, in a motion often associated with the exclamation, "Talk to the hand (because the ears ain't listening)," a phrase later popularized by Fran Drescher in the movie *Beautician and the Beast*. *See Terms of the 90s, Slang of the Nineties*, http://www.inthe90s.com/generated/terms.shtml (defining "Talk to the Hand" as "[a]nother way of saying 'I don't want to hear what you are saying.' "); *see also* Lynne Truss, *Talk to the Hand: The Utter Bloody Rudeness of the World Today, or Six Good Reasons to Stay Home and Bolt the Door* (2005).

The voir dire examinations of jurors X and Y contrast sharply with the examination of juror Z. Z expressed no antipathy toward the death penalty; to the contrary, he stated that he "believe[d] in the death penalty." In explaining his views, Z outlined a balanced and thoughtful position. For example, Z was discomfited by an earlier era in which "[i]t seemed like . . . [the death penalty] wasn't used at all," because he believed "there [a]re times when it would be appropriate [to impose the death penalty]." But he expressed caution that the death penalty be reserved for "severe situations": "I don't think it should never happen, and I don't think it should happen 10 times a week either." Z felt most comfortable imposing the death penalty where the defendant is "incorrigible and would reviolate if released," and less comfortable where the defendant is found to have been "temporarily insane." But he stated unequivocally that he could consider the death penalty as an option if told to do so.

In essence, Z's views on whether to impose the death penalty mirrored Washington's death penalty statute itself: He believed a defendant should be put to death where his crime was appropriately severe but not otherwise, and was willing to take into account mitigating factors (mental health issues, for example), aggravating factors (likelihood of recidivism, for example) and the particular circumstances of the instant murder. *See* Wash. Rev. Code §§ 10.95.060, 10.95.070. Additionally, he was open to considering other types of mitigating circumstances, such as "somebody's childhood" or "emotional development," was welcoming of his fellow jurors' views, and was accepting of the heavy responsibility assigned to jurors by the state. Most importantly, he promised he would "follow the law" without reservation.

Despite these assurances, the prosecutor protested that Z was too reluctant to impose the death penalty, and that he would only vote for death if convinced that the defendant would "kill again." The prosecutor thus moved to excuse juror

Z for cause, and the trial judge granted the motion without further inquiry.

**[5] 2.** In 1985, and again in 1987, the Supreme Court explained that the "standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment . . . is 'whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *Gray* v. *Mississippi*, 481 U.S. 648, 658 (1987) (quoting *Witt*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45)). The Supreme Court insisted that capital jurors not be struck for cause unless they are unable to follow the court's instructions. Even jurors "who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Id.* (quoting *Lockhart* v. *McCree*, 476 U.S. 162, 176 (1986) (Rehnquist, J.)).

**[6]** Further, the Supreme Court significantly circumscribed the state courts' role in excusing jurors for cause in capital cases: It held that

> [t]he State's power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would "frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths." To permit the exclusion for cause of other prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It "stack[s] the deck against the petitioner. To execute [such a] death sentence would deprive him of his life without due process of law."

*Id.* at 658-59 (alterations in original) (citation omitted) (quoting *Witt*, 469 U.S. at 423, and *Witherspoon*, 391 U.S. at 523).

Thus, it is—and was at the time of Brown's trial in 1993—clearly established that excusing a juror for cause in a capital case is unconstitutional, absent evidence that the juror would not follow the law.

**[7]** When the Washington Supreme Court upheld the trial judge's decision to excuse jurors X, Y and Z for cause, it found that both X and Y were "substantially impaired" in their ability to perform their duties as jurors. *Brown*, 940 P.2d at 585. Those findings are adequately supported by the record. But a similar finding is missing from the state court's discussion of juror Z. The court's entire review of Z's exclusion from the jury is as follows:

> Appellant did not object at trial to the State's challenge of [Z] for cause. At any rate, [Z] was properly excused. On *voir dire* he indicated he would impose the death penalty where the defendant "would reviolate if released," which is not a correct statement of the law. He also misunderstood the State's burden of proof in a criminal case and understood it to be "beyond a shadow of a doubt," although he was corrected later. The trial court did not abuse its discretion in excusing [Z] for cause.

*Id.* Nowhere did the court find that Z would be unable to follow instructions. Nor *could* the court have found this: Just like the juror at issue in *Gray*, juror Z "ultimately stated that [he] could consider the death penalty in an appropriate case." *Gray*, 481 U.S. at 653.[5] Had there been a finding that Z was "substantially impaired" in his ability to follow the law, it

---

[5]Indeed, juror Z's commitment to following instructions was stronger than the juror improperly struck in *Gray*. When Z was asked if he could consider voting for the death penalty, he responded with an unequivocal, "Yes, I could." When the juror in *Gray* was asked if she could vote for the death penalty, she responded only, "I think I could." *Gray*, 481 U.S. at 653 n.5.

would have been unreasonable. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1).

**[8]** The reasons that the court *did* give for upholding Z's exclusion are misplaced and insufficient. Z's statement that he would impose the death penalty where the defendant would be likely to kill again did not exclude the possibility that Z would vote to impose the death penalty in other circumstances as well. And the fact that Z misstated the law means nothing: If all prospective jurors who did not fully understand the law before the trial began were struck, only lawyers would be allowed to serve on juries (and only a handful of lawyers at that).

**[9]** Z's temporary misunderstanding of the prosecution's burden of proof—he initially thought the prosecution needed to prove guilt "beyond a shadow of a doubt"—was also irrelevant; it would have been easily corrected by the jury instructions, which Z gave every indication he would follow. In fact, the prosecutor himself conceded he was unconcerned with Z's confusion on this point:

> THE COURT: Counsel, any challenge to this particular juror?
>
> [PROSECUTOR]: I would, your Honor, not on the term beyond a shadow of a doubt, I think he would certainly stick with the reasonable doubt standard.

And when another juror expressed that she, too, thought the burden of proof was "to a point of a shadow of a doubt," the trial judge dismissed her confusion as unilluminating:

> She doesn't know technically what the definition of beyond a reasonable doubt is. I doubt that anybody in this room knows technically what beyond a reasonable doubt really means and even in your own

mind. . . . I was not so concerned with her responses of beyond a shadow of a doubt or crystal clear. I think that definitely could fit within the definition of a reasonable doubt.

**[10]** Finally, Brown's failure to object to juror Z's removal at trial does not alter the *Witherspoon* error analysis in this case. Brown raised the juror Z claim on direct appeal, and the Washington Supreme Court did not find the claim to be waived or procedurally barred. Nor does appellee allege that the claim is waived or barred, or that it was not exhausted in state court.

**[11]** In sum, excusing juror Z for cause was directly contrary to Supreme Court precedent, as was the Washington Supreme Court's decision to uphold the juror strike on direct appeal. *See* 28 U.S.C. § 2254(d)(1).

**[12]    3.** Having found that juror Z was erroneously excluded, it is unnecessary for Brown to demonstrate he was prejudiced by Z's exclusion. Prejudice is presumed. The Supreme Court has been equally clear on this point:

> [T]his Court in *Davis* surely established a *per se* rule requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under *Witherspoon* is eligible to serve, has been erroneously excluded for cause. . . .
>
>    . . . The instant case presents yet another opportunity for this Court to adopt a harmless-error analysis and once again we decline to do so.

*Gray*, 481 U.S. at 659-60 (citing *Davis* v. *Georgia*, 429 U.S.

122, 123-24 (1976) (per curiam) (Rehnquist, J., dissenting)). Thus, Brown's death sentence cannot stand.[6]

### Ineffective Assistance of Counsel

Brown's final claim is that his attorney provided ineffective assistance in various ways during the sentencing phase of his trial. Were we not granting habeas relief with respect to Brown's sentence for the reasons set forth above, this claim would merit significant attention. Should the state choose to seek the death penalty again on remand, however, Brown will have a new opportunity to receive effective assistance of counsel. We therefore need not reach this claim.

We also do not reach the newly certified issue subsumed within Brown's ineffective assistance of counsel claim— whether the district court erred by refusing to consider certain reports in its habeas evidentiary hearing. We are reversing the district court's decision regardless of whether it should have admitted the evidence.

\* \* \*

We reverse the district court's judgment denying the writ of habeas corpus and remand for issuance of a writ with respect to Brown's sentence, unless within a reasonable time set by the district court the state conducts a new penalty phase trial or vacates Brown's death sentence and imposes a lesser sentence consistent with law.

### REVERSED IN PART; REMANDED.

---

[6]We find no constitutional infirmity with Brown's conviction. *See Bumper* v. *North Carolina*, 391 U.S. 543, 545 (1968) (holding that *Witherspoon* error requires setting aside a death sentence, but is insufficient to require setting aside a conviction); *see also Gray*, 481 U.S. at 668 (finding that a juror was erroneously excluded from the jury in violation of *Witherspoon* and *Witt*, and holding that "[t]he judgment of the Supreme Court of Mississippi, *insofar as it imposes the death sentence*, is reversed" (emphasis added)).